Present:  All the Justices

DEXTER LEE VINSON

OPINION BY JUSTICE A. CHRISTIAN COMPTON
v.  Record Nos. 990612                November 5, 1999
              990613

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Von L. Piersall, Jr., Judge

On May 19, 1996, Angela Felton was brutally murdered in the City of Portsmouth.  Subsequently, during a 1998 eight-day trial, a jury convicted defendant Dexter Lee Vinson, upon not guilty pleas, of the following offenses in connection with the homicide:  Capital murder in the commission of abduction with intent to defile, in violation of Code § 18.2-31(1); object sexual penetration, in violation of Code § 18.2-67.2(A); abduction with intent to defile, in violation of Code § 18.2-48; and carjacking, in violation of Code § 18.2-58.1.

The jury fixed defendant's punishment at death for the capital offense based upon the vileness and future dangerousness predicates of the capital murder sentencing statute.  Code § 19.2-264.4.  Also, the jury fixed defendant's punishment at life imprisonment for each of the noncapital convictions. Following a February 1999 post-trial hearing, at which the trial court considered a probation officer's report, the court sentenced defendant in accord with the jury's verdicts.

The death sentence is before us for automatic review under Code § 17.1-313(A), see Rule 5:22, and we have consolidated this review with defendant's appeal of the capital murder conviction. In addition, by order entered March 22, 1999, we certified from the Court of Appeals of Virginia to this Court the record of defendant's appeals of the noncapital convictions (Record No. 990613). The effect of this certification is to transfer jurisdiction over the noncapital appeals to this Court for all purposes. Code § 17.1-409(A). Those appeals have been consolidated with the capital murder appeal (Record No. 990612).

As required by statute, we shall consider not only the trial errors enumerated by defendant but also whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. Code § 17.1-313(C).

The facts are virtually undisputed. The defendant, who did not testify at trial, now argues through his attorneys that, although he was present at the scene of the homicide, there are certain "inconsistencies" in the prosecution's evidence on the question whether he was the actual perpetrator of the offenses. However, when there are inconsistencies in this evidence, we shall construe the facts in the light most favorable to the

2

Commonwealth, as required by settled rules of appellate procedure.

On May 19, the victim, age 25, and her three children resided with Nethie Pierce and her children in Portsmouth. The victim and her children previously had lived with defendant, age 33, in Portsmouth for "about a year and a half." At the time of the homicide, the unmarried couple had been living apart about three weeks.

About 9:00 a.m. on the day in question, the victim borrowed Pierce's "1988 red Beretta" automobile to take the victim's children to school. "[I]n a hurry to get the kids to school," the victim wore only a "shift-type" robe and underwear. Pierce's 14-year-old daughter, Willisa Joyner, rode with the victim.

About 6:30 a.m. on the same day, Faye Wilson was completing a weekend stay with defendant in a Suffolk motel. Wilson owned a 1988 blue Mercury Tracer automobile, which she allowed defendant to use that morning.

After the victim delivered her children to school, she drove with Willisa to the home she had shared with defendant in order to "get the mail." Upon arrival, Willisa "got out of the car," at which time the victim saw the defendant driving a blue automobile. Willisa reentered the red vehicle when the victim said, "'get back in the car.'" As the victim "started driving,"

3

the defendant twice rammed the rear of the red car with the front of the blue car.

The victim stopped the red car and the defendant walked to the driver's side window where the victim was sitting.  He then "punched" out the window.  Next, defendant "grabbed" the victim, hit her in the face and chest with his hand, and "took her out of the car."  The defendant held the victim by the arm and, in the presence of bystanders, "snatched" off her robe leaving her standing in her "underclothes," screaming and bleeding from her nose and mouth.

Next, defendant "took" the victim to the blue car and "made her get in."  When the blue car "wouldn't start up," defendant "put her" in the red car "and they drove away."  Police officers arrived on the scene after defendant had abducted the victim; they obtained a description of defendant and of the red car.

Shortly thereafter, Vertley Hunter noticed from her home a red car, "wrecked in the back," that was "pulled off the street and parked behind" a vacant house in her neighborhood; boards were nailed over the windows of the house.  She observed a young "white female" and a young "black man" sitting in the vehicle, with the female sitting in the driver's seat with "her hand outside the window to duck off a cigarette that she was smoking."

4

According to Hunter, the man "got out on the passenger side of the car and went to the back . . . and got a piece of rope out." The man "leaned back into the car" holding the rope. Hunter heard the woman tell the man "to leave her alone so she could go on with her life," and heard her "ask the Lord to spare her life because he was going to kill her." At that time, the man was "[c]hoking her with the rope."

Then, the man "grabbed her by the hair from the back seat of the car and pulled her over the seat . . . and he pulled the rope from around her neck at the same time." He then "pulled her down in the floor" and "told her that he was going to kill her." While the woman was still inside the car, the man "slammed the door on her head twice," according to Hunter.

Next, Hunter saw the man kick dirt beside the car to cover blood that was on the ground. He then pulled off "a board" covering a window of the house, raised the window, and climbed inside through the window. Hunter saw the man enter the house twice and wipe blood from his person with a towel.

Hunter watched the events for a period of several hours until the man drove the red car into the woods behind the house and left the area around 11:00 a.m. During her testimony, Hunter identified defendant in open court as the man she observed committing the acts she described.

5

Janice Green, who also lived near the vacant house, testified that during the morning of May 19, she observed a man "messing around" with a red car in the yard behind the house. She saw the man pull "boards off the house" and enter the home twice. The second time, the man "was dragging" into the house from the car "something heavy"; she "thought it was a rug he was pulling." Green also identified defendant in open court as the man she observed at the vacant house.

On May 20, 1997, Portsmouth detective Jan Westerbeck went to the vacant house and discovered the victim's body inside a recently "busted wall" in one of the bedrooms. The body was nude and partially covered with a brown blanket; feces were found on and under her neck.

Forensic evidence connected defendant with the crimes. His fingerprints were found on the abandoned red car, on the kitchen sink of the vacant house, and on a pane of glass from the house's kitchen window. Also, the victim's DNA was matched to a blood stain found on a pair of blue shorts belonging to defendant. According to the witness Hunter, defendant was wearing a "sky blue short set" when she observed him. An expert placed the odds of the DNA on defendant's shorts being that of someone other than the victim at one in 5.5 billion.

An autopsy performed on the victim's body showed that she bled to death from deep cuts to both forearms, either of which

would have been sufficient to cause death.  The cut to the right forearm was two inches deep and severed two main arteries; the left forearm bore a similar wound that cut one artery.  The victim did not die instantaneously; it "probably would have taken her a few minutes, several minutes to die," according to the medical examiner.

The victim sustained numerous other injuries.  For example, there were additional knife wounds on her shoulders, neck, and cheek.  There were scratches on her buttocks and cuts on her torso and on one of her legs.  She suffered "blunt force trauma" to her head.

Additionally, she sustained significant vaginal injuries inflicted while she was alive.  She sustained a laceration of her inner vaginal lip, massive bruising over her vulva area, and a "massive laceration," which tore the tissue separating the vagina from the anus and which tore around her anal opening.  In the medical examiner's opinion, the vaginal injuries were not caused by an erect penis; the inner damage that was done in the vaginal area "would have been done by an object being penetrated in Miss Felton."

During the penalty phase of the trial, to prove defendant's future dangerousness, the prosecution presented evidence that defendant had assaulted a police officer in 1987 who was attempting to arrest him; had assaulted a correctional officer

7

in 1988 who was attempting to move him to a cell; and had resisted arrest in 1997 near a Suffolk convenience store so violently that it took eight police officers to subdue him. Additionally, the Commonwealth presented evidence that defendant previously had been convicted of receiving stolen goods, attempted statutory burglary, and two offenses of hit and run with personal injury.

In mitigation, defendant presented testimony from his 1982 high school band teacher, his mother, his step-father, his supervisor in the construction work that he performed, and a minister. Defendant was described as a "mentor" to a blind student in the band, as one who was "loved" by the victim's "kids," and as a person who would "do anything for anybody at work."

Defendant also presented the testimony of two mental health experts, both of whom concluded that defendant suffers from "intermittent explosive disorder" and that he was unable to conform his conduct to the requirements of law at the time of the crimes because of this disorder.

In rebuttal, the Commonwealth presented testimony of another mental health expert who, while agreeing that defendant had "the characteristics" of intermittent explosive disorder, said that "almost all violent criminals" fit that category of illness. This expert, Dr. Paul Mansheim, expressed the opinion

"that there is at least a fifty percent chance" that defendant would commit "another violent offense in the next five years."

On appeal, defendant contends that Virginia's capital murder statutes are unconstitutional. Every ground of alleged unconstitutionality relied upon by defendant has been previously resolved by this Court adversely to his present contentions, and he has advanced no persuasive reason warranting a departure from our prior decisions. Thus, his contentions are rejected.

Some of defendant's assignments of error are procedurally defaulted for lack of proper objection in the trial court. We will not consider for the first time on appeal nonjurisdictional issues not raised below. Rule 5:25.

Issues falling in this category are: The trial court erred in allowing opinion evidence upon the question whether the victim was the subject of object penetration; the trial court erred in allowing Dr. Mansheim's opinion that there was a fifty percent chance defendant would commit another violent offense within five years; and, the trial court erred by allowing use of a penalty verdict form that allegedly violated the state and federal constitutions.

The remaining issues raised by defendant generally relate to a pretrial matter, jury selection, several evidentiary questions, and sufficiency of the evidence of guilt.

9

First, defendant contends the trial court erred in not "granting Vinson a DNA expert." There is no merit to this contention.

Prior to trial, defendant requested appointment by the court of an independent DNA expert. At a hearing on the motion, defendant acknowledged he could locate no such expert, and the court continued the matter until the next day to allow defendant additional time to search for such an expert, after noting defendant's "request is somewhat vague." The next day, defendant reported to the court that he had been unsuccessful in his search, and the trial court denied the motion.

The trial court was correct. Implicit in the court's ruling was the finding that defendant failed to demonstrate the required showing of need for appointment of such an expert. See Husske v. Commonwealth, 252 Va. 203, 211-12, 476 S.E.2d 920, 925 (1996), cert. denied, 519 U.S. 1154 (1997) (indigent defendant seeking appointment of expert witness must demonstrate that subject necessitating expert assistance likely will be significant factor in defense and that defendant will be prejudiced by lack of expert assistance). Moreover, defendant had ample opportunity to locate an expert and, under these circumstances, there was no duty on the trial court to search independently for an expert witness for the defendant.

Next, defendant contends the trial court abused its discretion during voir dire in seating certain prospective jurors and dismissing others. We disagree.

Upon appellate review, this Court gives deference to the trial court's decision whether to retain or exclude prospective jurors. This is because the trial judge has observed and heard each member of the venire and is in a superior position to evaluate whether the juror's responses during voir dire develop anything that would prevent or substantially impair the juror's performance of duty as a juror in accord with the court's instructions and the juror's oath. Stewart v. Commonwealth, 245 Va. 222, 234, 427 S.E.2d 394, 402, cert. denied, 510 U.S. 848 (1993); Eaton v. Commonwealth, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990), cert. denied, 502 U.S. 824 (1991). A trial court's decision on this issue will be affirmed absent a showing of manifest error. Id. And, a juror's entire voir dire, not isolated portions, must be considered to determine a juror's impartiality. Mackall v. Commonwealth, 236 Va. 240, 252, 372 S.E.2d 759, 767 (1988), cert. denied, 492 U.S. 925 (1989).

Juror Clanton was properly stricken for cause. She stated unequivocally that if faced with the alternative of sentencing defendant to life imprisonment without parole, she would not even consider imposing the death penalty. The trial court's decision to exclude Clanton is supported by the record. Her

11

views on imposition of the death penalty would substantially impair her ability to follow the court's instructions.

Likewise, and for the foregoing reason, we hold that the trial court did not err in striking Jurors Dickens, Nicholson, Scott, Warren, and Terrell. All of those jurors indicated they could not impose the death penalty.

Furthermore, we conclude the trial court did not abuse its discretion by refusing to exclude jurors Richardson and Metcalfe. Although Richardson initially said during voir dire that he "probably would" automatically impose the death penalty upon a finding of guilt of capital murder, he later stated that he would follow the court's instructions and consider the sentencing options of both life or death. Examining Richardson's entire voir dire, we cannot say the trial court erred in seating him as a juror.

Metcalfe stated she could fairly and impartially decide the case. Near the end of her individual voir dire, however, she expressed some "hesitation" about serving on a capital murder jury, noting a concern for her "personal safety." In deciding to seat Metcalfe, the trial judge said "there's nothing in her statements that would indicate she could not . . . be fair. Her demeanor was that of a pretty self-assured person." The trial court ruled properly in seating her.

12

Next, defendant contends the trial court erred in admitting in evidence a statement he made in Suffolk to a Portsmouth detective when he was arrested by Suffolk police, accompanied by the Portsmouth detective, on May 20, the day after commission of the crimes. During the first day of trial, defendant moved to suppress the statement, and presented evidence on the motion. He argued "he was arrested for no reason" because "there was no warrant on file" in Suffolk for his arrest.

The evidence showed there were outstanding misdemeanor warrants for defendant's arrest on file in Portsmouth, and that the Portsmouth detective knew about the warrants, although they were not in the officer's hands at the time of arrest. The evidence also showed defendant, at that time, was under suspicion for abduction of the victim. Upon arrest, defendant "signed a legal rights advice form" and elected to make a statement.

The trial court denied the motion to suppress and later admitted the statement in evidence through the Portsmouth detective's testimony. In the statement, defendant denied seeing the victim in the past 48 hours and denied having recently been in Portsmouth.

The trial court did not err in admitting the statement, which actually set forth an alibi and was not a confession. The arrest was proper because the arresting officers had knowledge

13

of the outstanding misdemeanor warrants, and the police had every right to question him.  See Code § 19.2-81 (arrest for misdemeanor not committed in officer's presence valid under certain specified circumstances).  However, even if there was a violation of § 19.2-81 and even if the statement somehow can be considered a confession, suppression of the statement was not required.  Thompson v. Commonwealth, 10 Va. App. 117, 121, 390 S.E.2d 198, 200-01 (1990) (confession obtained during period of statutorily invalid arrest not subject to exclusion when accused constitutionally in custody and confessed voluntarily).

Next, defendant contends the trial court erred in admitting a blood sample when the custodian made a mistake in noting the date placed on the evidence envelope.  There is no merit to this contention.

Detective Westerbeck testified she was present when blood samples were taken from defendant on June 4, 1997.  After the blood was taken by a physician, the vials were dated June 4, 1997 and turned over to Westerbeck.  She initialed the vials, placed them in an envelope, and kept them in her exclusive care and custody until she gave them to an evidence technician.  However, Westerbeck inadvertently dated the envelope into which she placed the vials "June 3, 1997."

Defendant objected to introduction of the blood samples, stating that a "simple error like that in a case like this could

14

be highly prejudicial."  The trial court overruled the objection, after determining that the evidence the prosecutor was offering was, in fact, the blood taken from defendant on June 4.

On appeal, defendant contends the blood samples were inadmissible because they were not properly authenticated and there was a defect in the chain of custody.  We disagree.

The mistake in the date is inconsequential.  And, a chain of custody is properly established when the Commonwealth's evidence affords reasonable assurance that the exhibits at trial are the same and in the same condition as they were when first obtained.  Pope v. Commonwealth, 234 Va. 114, 121, 360 S.E.2d 352, 357 (1987), cert. denied, 485 U.S. 1015 (1988).  These samples met that criteria.

Next, defendant argues the trial court erred "in not granting the motion to strike as to the capital murder charge, the abduction charge, the abduction with the intent to defile charge, the object penetration charge and the carjacking charge."  Now conceding he was the person who abducted the victim, and not relying on any purported alibi, defendant contends the "circumstances suggest that Vinson drove away with Felton out of some misguided desire for reconciliation or a desire to punish her for leaving him, but not out of a specific intent to sexually molest her."  He argues the eyewitness

15

testimony that he was the perpetrator of the crimes is "inconsistent" and "unworthy of belief." We reject this argument.

A further recitation of the facts is unnecessary. It is sufficient to point out that the jury determines the credibility of the witnesses and that there is overwhelming credible evidence to establish defendant was the perpetrator of each of these crimes.

The only offense which requires further elaboration is the carjacking charge. To prove carjacking, the Commonwealth was required to establish that defendant seized control of the red automobile with an intent to permanently or temporarily deprive the victim of the possession or control of the vehicle by means of violence directed to her. Code § 18.2-58.1(B). The testimony of Willisa Joyner amply supports the finding that both the victim and the red car were seized by defendant through the continuing use of violence directed to the victim.

Next, in an obtuse argument, defendant complains about the manner in which the Department of Corrections responded to a subpoena duces tecum for records about his unadjudicated criminal acts. He also complains about the receipt in evidence of "certain unadjudicated criminal acts allegedly committed by" him. We reject both contentions. The first complaint merits no response. As to the second complaint, we merely note the law is

16

settled in this jurisdiction that prior unadjudicated criminal conduct is admissible at the penalty stage of a capital murder trial to establish future dangerousness.  Poyner v. Commonwealth, 229 Va. 401, 418, 329 S.E.2d 815, 827-28, cert. denied, 474 U.S. 865, 888 (1985).

Next, defendant argues the trial court erred in permitting Dr. Mansheim to testify in rebuttal about defendant's future dangerousness "when the defense's medical testimony did not directly state future dangerousness."  We disagree.

Even though defendant's medical experts did not use the term "future dangerousness" as applied to defendant, they opined about defendant's mental condition and offered excuses for defendant's behavior.  Thus, the trial court properly allowed the prosecutor to present evidence in rebuttal regarding the probability of defendant's future behavior.

Next, we reject defendant's conclusory argument that the trial court erred by permitting television cameras in the courtroom because his "right to a fair and impartial jury" was "prejudiced" by their presence.  By statute, the trial court "may solely in its discretion" allow cameras in the courtroom. Code § 19.2-266.  There was no abuse of that discretion in this case.

Next, as we have said, we must determine whether the sentence of death in this case "was imposed under the influence

17

of passion, prejudice or any other arbitrary factor." Code § 17.1-313(C)(1). Defendant candidly admits, "The record in this case does not clearly show passion or prejudice." Indeed, there is not a hint in the record that the determinations of vileness and future dangerousness were made arbitrarily. On the contrary, the record supports the conclusion that the sentence was appropriate under the circumstances.

Finally, upon the question of disproportionality and excessiveness, we determine whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crimes and the defendant. Bramblett v. Commonwealth, 257 Va. 263, 278, 513 S.E.2d 400, 410 (1999). See Code § 17.1-313(C)(2). In determining whether a death sentence is excessive or disproportionate, we consider records of all capital murder cases previously reviewed by this Court in which the death sentence was based upon both the vileness and future dangerousness predicates, including capital murder cases in which a life sentence was imposed. Jenkins v. Commonwealth, 244 Va. 445, 462, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993).

The defendant does not contend that the sentence is excessive or disproportionate. He merely reasserts an earlier contention, which was procedurally defaulted, that "the penalty

18

verdict form in this case was so defective that the jury's intent cannot be deduced from it."  We will not entertain such an argument because of the procedural default.

Manifestly, however, this sentence is not excessive or disproportionate.  Defendant brutally beat and abducted the victim.  Following the abduction, he beat and choked her, sexually assaulted her in a savage manner, and murdered her by inflicting deep cuts to both forearms.  Furthermore, in addition to the vile nature of the offenses, the evidence established that defendant is a violent person who, in the Attorney General's words, "has no respect for authority and who cannot be rendered non-violent even in a prison setting."  Juries in the Commonwealth generally impose the death sentence for crimes like those committed by this defendant.  See, e.g., Cherrix v. Commonwealth, 257 Va. 292, 313-14, 513 S.E.2d 642, 655-56 (1999); Hedrick v. Commonwealth, 257 Va. 328, 342-43, 513 S.E.2d 634, 642 (1999); Barnabei v. Commonwealth, 252 Va. 161, 179, 477 S.E.2d 270, 281 (1996), cert. denied, 520 U.S. 1224 (1997); and Clozza v. Commonwealth, 228 Va. 124, 138, 321 S.E.2d 273, 282 (1984), cert. denied, 469 U.S. 1230 (1985).

Consequently, we hold the trial court committed no error, and we have independently determined from a review of the entire record that the sentence of death was properly assessed.  Thus,

19

we will affirm the trial court's judgment in the capital murder case and in the noncapital cases.

                              Record No. 990612 — <u>Affirmed</u>.
                              Record No. 990613 — <u>Affirmed</u>.