JUSTICE HASSELL,
with whom JUSTICE KOONTZ joins, concurring in part and dissenting in part.
I.
Code § 17.1-313, which requires that this Court review a sentence of death, states in relevant part that we must consider “[wjhether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.” I dissent because I believe that the imposition of the sentence of death upon a mentally retarded defendant with an IQ of 59 is excessive and disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
n.
Dr. Evan S. Nelson qualified as an expert witness on the subjects of clinical and forensic psychology. He testified on behalf of the defendant, Daryl Renard Atkins. Dr. Nelson reviewed the defendant’s school records, psychological test data, and certain information related to the defendant’s capital murder conviction and his prior convictions. Dr. Nelson also interviewed members of the defendant’s family.
*391 Dr. Nelson administered the Wechsler Adult Score, also referred to as the WAIS-III intelligence test, to the defendant. This test was designed to measure the defendant’s IQ. Dr. Nelson stated:
“There are a number of IQ tests on the market. Some of them are for special niches of population. But the WAIS is one of the two that is recognized throughout the United States as a standard for assessing intelligence.
“It’s the one that’s most frequently cited, for example, in state laws for identifying who qualifies for a learning disability or a mental retardation, the one that’s most often cited in Federal disability laws for making determinations involving an IQ or neurologic deficits.”
According to Dr. Nelson, there are 13 major subsections of the test that he administered to the defendant. Dr. Nelson administered all 13 of the major subsections to the defendant and determined that the defendant had a full-scale IQ of 59. Dr. Nelson observed:
“Mental retardation is about two things. Number one, it’s about an IQ of around 70 or below, and there [is] some space there, 70 or plus or minus five points is the official criteria. . . .
“Secondly, adaptive behavior. Being mentally retarded isn’t just a low score on this test. It’s about lacking certain abilities to function independently compared to what you’d expect for other persons your age. That’s a really important criterion]. Because there are some people who can score really well or really poorly on this test but who either do or don’t function well in society. So you have to go out and find out by talking with family members and school records and employment records, if they have any, about how they function in the world at large. You need the two of them together to be able to say someone is mentally retarded.”
Dr. Nelson, who is a specialist in the assessment of mental illnesses, opined that the defendant was mentally retarded based upon his IQ score of 59 and his limited capacity for adaptive behavior. Dr. Nelson pointed out that in addition to the defendant’s low IQ score of 59, the defendant’s public school academic records “are crystal clear that he has been an academic failure since the very beginning.” Dr. Nelson testified that the “lack of variation” in the defendant’s *392 performance on the IQ test indicates that the test was properly administered and that the defendant was not “faking” when he took the test.
Even though the defendant was not classified as mentally retarded when he was a student in the Hampton Public Schools Division, his academic performance was very poor. He scored below the 20th percentile in almost every standardized test he took. He failed the second and tenth grades. He was socially advanced from the fourth grade to the fifth grade.
When the defendant was an eighth-grade student, he received failing grades in all his classes, and he scored in the 15th percentile of standardized achievement tests. When he was a tenth-grade student, he scored in the 6th percentile. The defendant, when a student in high school, was placed in lower-level classes for slow learners and classes with intensive instruction for remedial deficits. His grade point average in high school was 1.26 out of a possible 4.0. The defendant did not graduate from high school.
Dr. Stanton E. Samenow qualified as an expert witness in the subjects of clinical psychology and forensic psychology. He testified on behalf of the Commonwealth. Dr. Samenow interviewed the defendant twice. Dr. Samenow did not administer an IQ test to the defendant. Rather, he asked the defendant some questions.
Dr. Samenow testified that the defendant was able to relate to him certain recent events and historical facts. For example, the defendant knew the name of the Governor of Virginia and knew that former President John F. Kennedy’s son had died in an airplane accident. The defendant was also able to associate certain words and to tell a story utilizing certain pictures. Dr. Samenow did not give the defendant a complete intelligence test, but essentially picked and chose certain questions from various tests to query the defendant.
For example, during cross-examination, Dr. Samenow testified:
“As I indicated ... I gave portions of the Wechsler Memory Scale, the selected items of the Wechsler Adult Intelligence Scale, namely, from similarities, vocabulary and comprehension, and I also gave the Thematic Apperception Test, which in itself is not an intelligence test but it certainly does give some indication of a person’s use of syntax, language, vocabulary, and these were portions. I want to underscore, and I said this yesterday, portions of those tests.”
*393 Dr. Samenow also gave the following testimony:
“Q: In your interviews with the Defendant, did you ascertain any evidence suggestive of mental retardation?
“A: I found absolutely no evidence other than the IQ score that I knew of, because I reviewed a number of materials. No evidence did I find other than that indicating that the Defendant was in the least bit mentally retarded.
“Q: Do you have an expert opinion as to the Defendant’s intellect?
“A: He is of average intelligence, at least.
“Q: Explain the basis of how you came to this conclusion.
“A: Largely though several indices. One is the vocabulary and syntax that he used in talking with me. And I have many examples.”
Significantly, Dr. Samenow testified that Dr. Nelson’s calculations of the scores on the tests administered to the defendant to ascertain the defendant’s IQ were correct. Dr. Samenow did not conduct a full evaluation of the defendant, nor did he use questions from the most recent test when he examined the defendant.
III.
“Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: Communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests itself before age 18.”
Carroll J. Jones, An Introduction to the Nature and Needs of Students with Mild Disabilities: Mild Mental Retardation, Behavior Disorders, and Learning Disabilities, 39 (1996).
Persons with an IQ level in the range of 50 through 55 to 70 are classified as having mild mental retardation. The following table of diagnostic criteria for mental retardation appears in Kaplan & Sadock’s Comprehensive Textbook of Psychiatry 2598, Benjamin J. Sadock & Virginia A. Sadock eds., (7th ed. 2000):

*394
“Mental Retardation IQ range Mental age (years)

Mild 50-69 9 to under 12
Moderate 35-49 6 to under 9
Severe 20-34 3 to under 6
Profound Below 20 Less than 3”
According to Doctors Kaplan & Sadock:
“Mild mental retardation (I.Q., 55 to 70) characterizes the largest group of persons with mental retardation, possibly as many as 85 percent of the total. These individuals appear similar to nonretarded individuals and often blend into the general population in the years before and after formal schooling. Many achieve academic skills at the sixth grade level or higher, and some graduate from high school. As adults, many of these individuals hold jobs, marry, and raise families — yet at times they may appear slow or need extra help negotiating life’s problems and tasks.”
Id. The evidence of record shows that the defendant’s full-scale IQ score of 59 falls within the range considered mild mental retardation. Less than one percent of the American population at large has a score of 59 or below.
I would commute the defendant’s sentence of death to life imprisonment without the possibility of parole because I believe that the sentence of death is “excessive ... to the penalty imposed in similar cases, considering both the crime and the defendant.” Upon my independent review of the entire record in this case, see Vinson v. Commonwealth, 258 Va. 459, 472, 522 S.E.2d 170, 179 (1999), cert. denied, _ U.S. _, 120 S.Ct. 2226 (2000), it is clear that this defendant is mentally retarded. This defendant, who has an IQ of 59 and a limited capacity for adaptive behavior, has the cognitive ability or mental age of a child between 9 and 12 years of age. This Court has never approved of the imposition of the death penalty upon a defendant who is mentally retarded and has an IQ as low as 59.
I simply place no credence whatsoever in Dr. Samenow’s opinion that the defendant possesses at least average intelligence. I would hold that Dr. Samenow’s opinion that the defendant possesses average intelligence is incredulous as a matter of law. Indeed, I am perplexed that Dr. Samenow, who did not administer a complete IQ test to the defendant and admittedly asked the defendant questions based upon bits and pieces of outdated tests to supposedly evaluate the *395 defendant, would opine that this defendant possesses at least average intelligence.
Dr. Samenow admitted that he does not contest the manner in which Dr. Nelson computed the defendant’s IQ scores. Additionally, Dr. Samenow admitted that some of the questions he administered to the defendant were based upon a test developed in 1939. Dr. Same-now described this test as “[a]n old standard,” yet, he used this obsolete test even though he acknowledged that the Ethical Principles of Psychologists and Code of Conduct, Ethical Standards 2.07 (1992) of the American Psychological Association, prohibits the use of obsolete tests and outdated test results and specifically states that “psychologists do not base such decisions or recommendations on tests and measures that are obsolete and not useful for the current purpose.”
Moreover, according to the testimony and medical literature, an assessment of mental retardation is predicated upon the subject’s IQ score and the subject’s adaptive behavior. Dr. Samenow, however, could not validly opine about the defendant’s adaptive behavior because he had not interviewed anyone who had observed the defendant prior to his incarceration. Additionally, Dr. Samenow’s methodology is flawed because when he improperly administered portions of certain tests, he failed to comply with the relevant instructions for those tests.
Also, I place no credence in Dr. Samenow’s opinion that the defendant possesses an average intelligence because of the defendant’s vocabulary and his ability to relate certain historical facts to Dr. Samenow. It is common knowledge that many children as young as eight years old are capable of relating the same historical facts that the defendant described and possess a vocabulary similar to the defendant’s vocabulary.
I recognize that the United States Supreme Court has held that the imposition of the death penalty upon mentally retarded criminal defendants does not violate the Eighth Amendment to the United States Constitution. See Penry v. Lynaugh, 492 U.S. 302, 340 (1989). However, the issue in this appeal is not whether the imposition of capital punishment upon a mentally retarded criminal defendant violates the federal Constitution. Rather, the issue in this appeal is whether under Code § 17.1-313 the imposition of the sentence of death is excessive or disproportionate to the penalty imposed in similar crimes, considering both the crime and the defendant. I would answer that question in the affirmative. I believe that the imposition *396 of the sentence of death upon a criminal defendant who has the mental age of a child between the ages of 9 and 12 is excessive, considering both the crime and the defendant.
IV.
I recognize that this defendant has a history of violent criminal behavior. I also recognize that this defendant is clearly a significant danger to society. Therefore, I would commute this defendant’s sentence to life imprisonment without the possibility of parole.