COURT OF APPEALS OF VIRGINIA

Present:  Judges Chaney, Frucci and Senior Judge Annunziata
Argued at Fairfax, Virginia

UNPUBLISHED

JASON THESTON PAYNE

                                              MEMORANDUM OPINION* BY
v.       Record No. 0824-23-4                 JUDGE ROSEMARIE ANNUNZIATA
                                              SEPTEMBER 24, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF STAFFORD COUNTY
J. Bruce Strickland, Judge

Kelsey Bulger, Deputy Appellate Counsel (Virginia Indigent
Defense Commission, on briefs), for appellant.

Elizabeth Kiernan Fitzgerald, Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Jason Theston Payne appeals his conviction for aggravated involuntary manslaughter

while driving under the influence in violation of Code § 18.2-36.1.  He argues on appeal that the

trial court erred in overruling his objections to certificates of analysis and denying his motion to

strike.  He also asserts that the trial court abused its discretion in sentencing him to a total of 15

years of active incarceration for that offense and felony driving under the influence under Code

§§ 18.2-266 and -270.  Finding no error, we affirm the trial court's judgment.

BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing

party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting

*Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  In doing so, we "discard the evidence of the

accused in conflict with that of the Commonwealth, and regard as true all the credible evidence

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Ray v. Commonwealth*, 74 Va. App. 291, 307 (2022) (alteration in original) (quoting *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021)).

On October 24, 2021, Mohamed Hussein, his parents, and brother went to John Memorial Park. Mohamed was 24 years old and Mohamud—his brother—was 23. River Road runs through the park and contains a marked crosswalk. There are three traffic signs related to this crosswalk: a road sign before the crosswalk warning drivers of pedestrians and bicyclists crossing, a sign next to and directly pointing at the crosswalk with the same warning, and a stop sign for pedestrians using the crosswalk. River Road has a 35 mile-per-hour speed limit at that crosswalk.

Mohamed and Mohamud, walking ahead of their parents, reached the crosswalk. They stopped at the crosswalk and looked both ways for vehicles. Not seeing any, Mohamed crossed first, and Mohamud was several feet behind him. As Mohamed walked across River Road, Payne struck Mohamed with his pickup truck.[1] Mohamud testified that Payne drove "very fast" and there was no time to move out of the way. The impact threw Mohamed into a ditch on the side of the road. Initially, Payne continued driving, but turned around and came back. Mohamud called 911 and his parents. Mohamed later died from the blunt force trauma to his head and chest. Photographs of Payne's truck showed damage to the front-left corner headlight area and dents over the front-left tire wheel well, as well as significant damage to the windshield on the left side.

Deputy Jett of the Stafford County Sheriff's Office responded to the scene. He noticed that Payne had difficulty maintaining his balance or walking, and smelled a strong odor of alcohol on his breath. When Jett asked Payne if he had consumed any alcohol, Payne admitted to drinking several

---

[1] On cross-examination, Payne confronted Mohamud with his statement in a prior hearing that Mohamed was running at the time of the collision; Mohamud explained that he was confused by that question and emphasized that they were walking when Payne hit Mohamed. Deputy Russo later testified that Mohamud told him during an interview that the brothers stopped at the crosswalk and walked across the road.

40-ounce beers and liquor drinks.  Jett arrested Payne after he showed indications of intoxication on field sobriety tests.[2]

When Jett asked Payne if he wanted to say anything to the magistrate, Payne stated that "[t]wo pedestrians walked across the walkway out of my reach and I struck the male subject."[3] During his interview, Payne stated that he was traveling down River Road, that "there was a crosswalk," and that the "next thing he knew" he struck someone; he had not seen anyone beforehand.  In that interview he denied consuming any alcohol.  When confronted with the odor of alcohol on his breath, Payne claimed it was from the day prior.  When asked again, he admitted to drinking earlier that same day.  Payne also alleged that he was driving 35 miles per hour at the time of impact.

After Payne failed to provide sufficient breath samples for breath machine analysis, Jett obtained a search warrant for his blood.  Jett watched a hospital nurse open a Department of Forensic Science ("DFS") blood draw kit and unwrap a sealed needle.[4]  The nurse drew two vials of Payne's blood and placed a seal over their tops.  She wrapped a sticker around the outside of the vials, signed an integrity seal, and placed the vials with paperwork back into the bloodwork kit box.  She handed that box to Jett, who then mailed it to DFS for analysis.

DFS policy requires employees that receive such packages to inspect incoming vials and "notate anything unusual."  DFS employee Daniel Chen received the mailed bloodwork package on October 29, 2021.  He noticed that one of the vials was broken; although unusual, DFS receives a bloodwork kit with a broken vial two or three times a year, on average.  Chen notified DFS expert

---

[2] On appeal, Payne does not dispute that he was intoxicated when he struck Mohamed.

[3] Jett read this statement to the magistrate; when the magistrate asked Payne under oath whether he had any additional statements, he answered that what Jett "said is exactly what I said."

[4] Deputy Kulbeth also watched the blood draw procedure.

forensic toxicologist Dr. Jon Dalgleish of the broken vial. Dalgleish checked the package; Chen then discarded the broken vial and cleaned the remaining vial, following DFS procedures. Chen did not document any damage, leaking, cracks, or issue with the seal for the unbroken vial. A forensic scientist then analyzed the unbroken vial, and Dalgleish certified the results. Analysis of Payne's blood taken after the collision showed a blood alcohol content ("BAC") of .25. Using retrograde extrapolation, Dalgleish estimated that someone with Payne's tested BAC result would have had a .27 to .31 BAC at the time of the collision.

After discovering that Payne had sought hospital treatment the night before the collision, Kulbeth obtained a search warrant for those records and the six tubes of Payne's blood drawn during that care. The tubes were sealed and in a plastic bag, and hospital records indicate the blood samples were taken at 9:22 p.m.[5] Kulbeth placed the tubes and a request for analysis into a bag; he sealed that bag and wrote his initials on that seal. Kulbeth then placed it into a secure refrigerator locker. "K. Stevenson" later hand-delivered the package to DFS employee Cody Glick on November 12, 2022. A forensic scientist analyzed one of the vials. Dalgleish reviewed and certified this analysis, which showed a BAC of .32. Dalgleish also reviewed Payne's hospital treatment records, including their own testing result of 371 mg/DL of ethanol in Payne's blood.[6]

Dalgleish testified that a person with that level of blood alcohol would have symptoms impacting their fine and gross motor skills, ranging from issues with balance and coordination to loss of consciousness. Symptoms could also include seeing "double," significantly impaired peripheral vision, and slowed reaction times. Dalgleish testified that although tolerance lessens the "outward physical appearance" of intoxication, it does not lessen the "slowing down" of the brain's internal processes.

---

[5] This was approximately 17 hours before the collision.

[6] Dalgleish opined that this result equaled a .30 to .33 BAC, consistent with his analysis.

Tarek Omar testified as a defense expert in mechanical and structural engineering. Using the police crash report that contained Payne's self-reported speed, photos of Payne's truck, and the autopsy, he ran analyses on a computer simulation to determine Mohamed's speed at the time of the accident. He opined that Mohamed ran into the side of Payne's vehicle at "almost" nine miles per hour. He admitted that, in reaching his results, he initially ran the analysis with the assumption that Mohamed was running at three miles per hour, but those results showed far less damage to the truck than what occurred. To achieve simulated damage consistent with that actually received by the truck, Omar altered the simulation of Mohamed's speed, but did not change the speed of Payne's truck. Although he based his conclusions on the placement of truck damage, he also admitted to not knowing what damage may have existed before Payne struck Mohamed.

The jury found Payne guilty of aggravated involuntary manslaughter while driving under the influence. Payne then also pleaded guilty to felony driving under the influence, third offense within ten years.[7] Before sentencing, Payne argued that he was a "good candidate for rehabilitation" and that he took responsibility for his actions. The Commonwealth argued that Payne had a consistent history of driving under the influence and that his actions showed a callous disregard for others' safety, resulting in Mohamed's death. In sentencing Payne, the trial court noted that Payne was already on bond for a similar offense when he struck and killed Mohamed, and expressed its concern for public safety. The trial court sentenced Payne to 5 years' incarceration for felony driving under the influence and 20 years' incarceration with 10 years suspended for aggravated involuntary manslaughter. This appeal followed.

---

[7] Though Payne was indicted with both charges after the collision, the charges were severed pretrial.

ANALYSIS

I. Chain of Custody

At trial, Payne objected to the Commonwealth introducing into evidence the certificates of analysis for the post-collision blood draw as well as the blood from Payne's hospital treatment. He argued that there were gaps in the chain of custody and that the Commonwealth failed to present sufficient foundation for either certificate. He asserts on appeal that the trial court erred in overruling his objections and allowing those certificates into evidence.

"The determination on a chain of custody challenge lies within the trial court's broad discretion and will not be overturned on appeal absent an abuse of that discretion." *Pope v. Commonwealth*, 60 Va. App. 486, 511 (2012) (citing *Crews v. Commonwealth*, 18 Va. App. 115, 118 (1994)). Under this standard, "only in those cases where 'reasonable jurists could not differ' has an abuse of discretion occurred." *Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)).

When the Commonwealth seeks to introduce evidence that has been seized and analyzed, the chain-of-custody rule exists "to establish that the evidence obtained by the police was the same evidence tested." *Hargrove v. Commonwealth*, 53 Va. App. 545, 553 (2009) (quoting *Brown v. Commonwealth*, 21 Va. App. 552, 555 (1996)). The Commonwealth must present evidence proving each "vital link in the chain of custody," but it does not bear an absolute burden of demonstrating that "all possibility of tampering" has been eliminated. *Pope*, 60 Va. App. at 511 (quoting *Robinson v. Commonwealth*, 212 Va. 136, 138 (1971)). As such, "[a] court need not hear . . . from every witness who physically handled the samples for the [evidence] to be admissible." *Anderson v. Commonwealth*, 48 Va. App. 704, 717 (2006). The Commonwealth "need only provide 'reasonable assurance' that the evidence obtained by the

police was the same evidence tested." *Id.* (quoting *Vinson v. Commonwealth*, 258 Va. 459, 469 (1999)). Thus, "where there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight of the evidence." *Jeter v. Commonwealth*, 44 Va. App. 733, 739 (2005) (quoting *Reedy v. Commonwealth*, 9 Va. App. 386, 391 (1990)).

### A. The Post-Collision Blood Draw

On appeal, Payne argues that the "record is silent" as to who handled the package after Jett mailed it. Although he concedes that such documentation is not normally necessary,[8] he argues that the Commonwealth needed to present such evidence in this case due to the presence of a broken vial. We disagree.

Dalgleish testified that DFS has protocols for receiving evidence, cleaning vials, and documenting issues. He further confirmed that those procedures were followed. Although one of the vials was broken, that broken vial was not tested. Moreover, there was no evidence that the *tested* vial was damaged, broken, or unsealed.

When a certificate of analysis notes that *the container* was not sealed on arrival, the evidence fails to establish "that the vial in the unsealed container was the same vial which was originally placed there by the person taking the blood sample," and the resulting certificate of analysis is not admissible. *See Williams v. Commonwealth*, 10 Va. App. 636, 639 (1990). But here, the container itself was sealed, and the unsealed vial was not tested. Instead, DFS discarded the unsealed vial and only tested the sealed, intact vial. Payne can point to no evidence in the record that the tested vial was unsealed or damaged. Therefore, the trial court did not abuse its discretion in admitting the certificate and allowing the jury to assign weight to the issue of the broken vial.

---

[8] *See Robertson v. Commonwealth*, 12 Va. App. 854, 857 (1991) (holding that without evidence of mishandling, the Commonwealth does not need to present testimony from mail carriers to satisfy chain of custody for sealed evidence).

## B. The Hospital Blood Vials

Payne argues that, because there was a 19-day gap between Kulbeth placing the sealed hospital blood vials in the refrigerated evidence locker and its hand-delivery to DFS, the evidence failed to establish a sufficient chain of custody. We disagree. Kulbeth took possession of the vials from the hospital, packaged and sealed them with his initials, and then submitted them into the evidence locker. He filled out a request for analysis that specifically noted that the vials were sealed. Those items were then received by DFS 19 days later. Dalgleish testified that DFS procedures require receiving employees to note any issues with received evidence, including broken or unsealed vials. Dalgleish reviews that documentation when he certifies test results. He certified the testing of the hospital vials. There is no evidence in the record that there were any issues with the seals or that the evidence became unsecured between Kulbeth's possession and DFS analysis. Even though it was 19 days later, there is "'reasonable assurance' that the evidence obtained by the police was the same evidence tested." *Anderson*, 48 Va. App. at 717 (quoting *Vinson*, 258 Va. at 469). Therefore, the trial court did not err in admitting the evidence and allowing the jury to account for the gap in time and determine the weight of that evidence.[9]

## II. Sufficiency of the Evidence

After the Commonwealth rested, Payne made a motion to strike arguing that the evidence failed to establish that his driving was gross, wanton, and showed reckless disregard for human life as required for aggravated involuntary manslaughter. The trial court denied his motion. Payne renewed his motion to strike after he presented his expert witness and argued the evidence failed to

---

[9] We also note that any error in admitting this certificate is harmless. Dalgleish reviewed the medical records from that same hospital visit and determined that the hospital's own testing showed a BAC of .30 to .33. Even had this certificate been excluded, the jury still would have had Payne's BAC results.

prove that Payne caused Mohamed's death because Mohamed ran into Payne's truck; he also reargued the aggravation issue. The trial court again denied his motion.

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

### A. Causation

"Any person who, as a result of driving under the influence[,] . . . *causes* the death of another person, shall be guilty of involuntary manslaughter." Code § 18.2-36.1 (emphasis added). "In a prosecution brought under Code § 18.2-36.1, the Commonwealth is required to prove 'a causal connection between the driver's intoxication and the death of another person.'" *Hall v. Commonwealth*, 32 Va. App. 616, 632 (2000) (en banc) (quoting *Pollard v. Commonwealth*, 20 Va. App. 94, 99 (1995)). "A proximate cause is 'an act or omission that, in natural and continuous sequence unbroken by a superseding cause, produces a particular event and without which that event would not have occurred.'" *Rich v. Commonwealth*, 292 Va. 791,

800 (2016) (quoting *Brown v. Commonwealth*, 278 Va. 523, 529 (2009)). "Because an event can have more than one proximate cause, criminal liability can attach to each actor whose conduct is a proximate cause unless the causal chain is broken by a superseding act that becomes the sole cause of the [event]." *Id.* (alteration in original) (quoting *Brown*, 278 Va. at 529). "Generally, causation is an issue for the jury to decide." *Hall*, 32 Va. App. at 632.

Payne argues that Mohamed ran into the crosswalk and Payne's truck and that these are superseding acts breaking the causal chain. We disagree. Payne alleges in his brief that "[t]he only evidence in the record regarding Mr. Payne's driving up until the collision suggests he was traveling at an appropriate speed." Instead, the record shows that Mohamud testified that Payne drove "very fast" and at a speed that made it impossible to move out of his way as Payne drove into the crosswalk and struck Mohamed. Although not an exact estimate of speed, the jury was also entitled to review the damage to Payne's truck and Mohamed's injuries to conclude that Payne drove faster than 35 miles per hour.

Payne relies on his own statement to police to support the conclusion that his speed was 35 miles per hour. But Payne was heavily intoxicated while driving and speaking to police, and the jury was entitled to weigh those statements accordingly.[10] Even if the jury had been required to take Payne's self-reported speed as fact, he also stated that Mohamed *walked* into the intersection.

Nor does the damage to Payne's truck prove his theory of the collision. Payne points to the damage on the side—rather than the front—of Payne's truck as evidence that Payne "simply had no time to stop before the collision." Although there are dents on the side of his truck above the wheel well, the front-left corner of Payne's truck was also damaged. The jury could infer

---

[10] Given that Payne's expert also presumed a 35 mile-per-hour speed in his analysis, the jury was similarly entitled to disregard his testimony.

that Payne struck Mohamed with the front-left corner of his truck, and the dents to the wheel well occurred as secondary points of impact either before or after Mohamed struck the windshield. The record further lacks any evidence as to the state of Payne's truck before the collision; the wheel well damage may not have resulted from striking Mohamed at all.

Even had the evidence proved that Mohamed had taken some negligent action before he was hit, "[c]ontributory negligence has no place in a case of involuntary manslaughter." *Id.* at 632 (quoting *Bell v. Commonwealth*, 170 Va. 597, 616 (1938)). "Only if the conduct of the decedent amounts to an independent, intervening act *alone* causing the fatal injury can the accused be exonerated from liability for his or her criminal negligence." *Id.* at 633 (emphasis added) (quoting *Hubbard v. Commonwealth*, 243 Va. 1, 14 (1992)).

The jury was entitled to conclude from the evidence that Payne's heavy intoxication resulted in delayed comprehension, reaction time, and limited vision and that his negligence was a proximate cause of Mohamed's death. We therefore find no error in the trial court's decision to deny the motion to strike and permit the jury to weigh the evidence and determine causation.

### B. Aggravated Involuntary Manslaughter

"If, in addition, the conduct of the defendant was so gross, wanton and culpable as to show a reckless disregard for human life, he shall be guilty of aggravated involuntary manslaughter . . . ." Code § 18.2-36.1(B). Heavy intoxication will be sufficient to support such a finding. *See Stevens v. Commonwealth*, 272 Va. 481, 488 (2006) (finding a .24 or .25 BAC sufficient for aggravated involuntary manslaughter). Payne argues that his BAC alone was not sufficient because there was no evidence that he was driving poorly. But under Virginia Supreme Court precedent, his BAC "approximately three times the legal limit . . . alone justifies a finding that [his] conduct was gross, wanton, and culpable." *Id.* Thus, we find no error in the trial court's decision to deny the motion to strike.

- 11 -

### III. Sentencing

Finally, Payne asserts on appeal that the trial court abused its discretion in sentencing him to a total of 15 years of active incarceration for aggravated involuntary manslaughter and felony driving under the influence. He argues that the trial court did not properly consider his mitigation evidence, "failed to acknowledge [Payne's] strong family support," and noted that it "made no mention of [his] potential for rehabilitation." We disagree.

We review a sentencing decision under an abuse-of-discretion standard. *Cellucci v. Commonwealth*, 77 Va. App. 36, 45 (2023) (en banc). "A trial court abuses its discretion by failing to consider a significant relevant factor, giving significant weight to an irrelevant or improper factor, committing a clear error of judgment, or making a mistake of law." *Id.* at 46 (citing *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564-65 (2016)). "[B]arring clear evidence to the contrary," however, we "will not presume that a trial court purposefully ignored mitigating factors in blind pursuit of a harsh sentence." *Guest v. Commonwealth*, 78 Va. App. 187, 197 (2023) (quoting *Bassett v. Commonwealth*, 13 Va. App. 580, 584 (1992)); *see also Cellucci*, 77 Va. App. at 52 ("[T]he trial court was not obligated to find that the evidence highlighted by the appellant actually mitigated his crime."). And when a sentence "is within the statutory limits fixed by the legislature, the assumption is that the sentence will not be disturbed on appeal." *Cellucci*, 77 Va. App. at 48 (citing *Bassett*, 13 Va. App. at 582).

At the time that Payne drove drunk and killed Mohamed, he was already on bond for driving under the influence. He had three prior convictions for driving under the influence in his record, the earliest being a 2007 conviction for driving under the influence, second offense within ten years.

Before sentencing Payne, the trial court asked for a moment of quiet "to contemplate" the evidence it heard. It noted that "the loss of Mohamed Hussein" "was not deserved," "was not

fair," "was not just," and "was entirely preventable." The trial court shared its belief that "[j]ustice unlike life must be fair" and that its decision "must be measured." The trial court then explicitly listed factors it considered in pursuit of a fair and measured decision: "the protection of society against crime," "deterrence of the offender from repeat offenses," "deterrence from others committing the offense," "the rehabilitation of the offender,"[11] "the punishment or retribution for the offense," "upholding respect for the law," and "removing the offender from society" when it is "necessary to protect the public from further criminal activity by the defendant," when "the defendant is in need of correctional treatment which can most effectively or only be provided in confinement," or when "less restrict[ive] measures have failed to correct the offender or any other sentence would be disproportionate to the seriousness of the offense."

Although the trial court acknowledged Payne's struggle with alcoholism, the court concluded "that we are here today because of acts that [Payne] chose to commit. Of decisions that [Payne] made." The record does not support a finding that "the trial court committed a clear error in judgment when weighing the sentencing factors." Payne's sentence was within the statutory ranges permitted by the legislature. Code §§ 18.2-10, -36.1, -270. Accordingly, we find that the trial court did not err when considering the evidence and sentencing Payne to 15 years of active incarceration, given his apparent danger to the community and likelihood of reoffending.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

*Affirmed.*

---

[11] Payne argues in brief that the circuit court erred by failing to consider his mitigating evidence; namely, the likelihood of his rehabilitation predicated on family support. But the circuit court explicitly listed Payne's capacity for rehabilitation as one relevant factor in its analysis, and Payne presents no further argument explaining how the trial court erred in its consideration of that issue.