# David Lee Fisher

## v.

## Commonwealth of Virginia

Record No. 880091

November 18, 1988

Present: Carrico, C.J., Poff, Compton, Stephenson, Russell, and Thomas, JJ., and Gordon, Retired Justice

404

*G. Carl Boggess; Harry W. Garrett, Jr. (Garrett & Boggess*, on brief), for appellant.

*(Craig S. Cooley*, for appellant, on ineffective assistance of counsel claim.)

*Robert B. Condon, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

David Lee Fisher was convicted by a jury of capital murder (murder for hire, Code § 18.2-31(b)). At the penalty stage of his bifurcated trial, the jury heard evidence of the defendant's history and evidence in mitigation. After further deliberation, the jury returned a verdict fixing Fisher's punishment at death, based upon the "future dangerousness" predicate of Code § 19.2-264.4(C). After reviewing a pre-sentence report and conducting a further hearing, the court entered judgment on the jury verdict by final order entered November 2, 1987. We have consolidated Fisher's appeal with the automatic review of his death sentence required by Code § 17-110.1 and have given both matters priority on our docket.

## I. THE EVIDENCE

Pursuant to established principles of appellate review, the evidence will be stated in the light most favorable to the Commonwealth. In 1983, Fisher and his victim, David Wilkey, were both residents of Charlotte, North Carolina. Wilkey's parents had separated in Norfolk, Virginia, when Wilkey was three months old and his mother had moved to Florida with him. When Wilkey was 17 years old, he left his mother's home and went to Norfolk on a fruitless search for his father. He finally went to live in Charlotte with a cousin of his father. Wilkey had a ninth-grade education and was 18 years old at the time of his death.

Fisher met Wilkey at a motel in Charlotte in late 1982 and appeared to befriend him. Wilkey moved into Fisher's apartment and occasionally worked for him. Fisher was in the business of transporting bodies for a funeral home and for the coroner. Fisher devised a plan whereby Wilkey would become close to a young woman named Bonnie Jones, Fisher would obtain an insurance policy on her life, and Wilkey would kill Bonnie for a share of the insurance proceeds. Fisher went so far as to buy Wilkey a car and provide him with money to date Bonnie, but Wilkey fell in love with Bonnie and backed out of Fisher's scheme. Wilkey and Bonnie had plans to return to Florida to be married the first week in December 1983.

In the summer of 1983, Fisher, having learned of Wilkey's defection, told Bobby Mulligan, who was, like himself, a frequenter of coffee houses in Charlotte, that he wanted to get his money back from Wilkey. Fisher proposed that if Mulligan would agree to shoot Wilkey while the three were on a hunting trip, and make

the killing appear accidental, Fisher would arrange to insure Wilkey's life and would divide the proceeds with Mulligan.

Fisher also approached Gerald Steadham, yet another frequenter of Charlotte coffee houses, with a proposal to push Wilkey off a ledge while on a fishing trip. Steadham accompanied Fisher to an insurance office where Fisher obtained a policy on Wilkey's life. Fisher had no legitimate insurable interest in Wilkey, but nevertheless obtained a policy on Wilkey's life with Kentucky Central Life Insurance Company for $50,000 with a double indemnity clause in case of death by accident. Fisher paid the $89.50 initial premium.

The original application for insurance, submitted in September 1983, was taken by an insurance agent in Charlotte named Kenneth Daren Tietsort. It showed Fisher as owner and beneficiary of the policy. Fisher identified himself as Wilkey's "guardian." Upon receipt of the application at the company's office in Lexington, Kentucky, the company wrote to Tietsort to ascertain whether Fisher was in fact a court-appointed guardian. Tietsort telephoned the company and suggested that the beneficiary be shown as Wilkey's estate until Fisher's status could be verified. The policy was issued in that form on September 27, 1983.

In October, 1983, the company received three additional documents from Tietsort: an "amendment to application" signed by Tietsort and two "requests for change of primary beneficiary," purportedly signed by David Fisher and David Wilkey, respectively. These papers requested that the beneficiary be changed from Wilkey's estate to "David Fisher, personal friend." On October 11, the company refused to approve the change, questioning the genuineness of Wilkey's change-of-beneficiary form. On October 24, however, the company reversed its position and approved the change of beneficiary. The evidence does not reveal what motivated this change of position.

About this time, Fisher told Mulligan that he had experienced some problem getting an insurance policy on Wilkey's life, but that he had persuaded an insurance man to "take care of it" for a promise of one-third of the proceeds. Fisher promised Mulligan $38,000, more than one-third, because Mulligan was to do the actual killing. Fisher's plan was to go to Bedford County, Virginia, near the residence of his ex-wife, on the opening day of deer season in Virginia. Included in the party were to be Wilkey, Fisher, Mulligan, and Jody Ayers, a 16-year old son of Fisher's ex-wife,

who was to be brought along to make their visit to Bedford County "look natural." The plan was for Fisher to provide guns for the party and later dispose of the murder weapon and try to have Wilkey's body cremated.

The hunting trip took place in Bedford County on November 21, 1983, as planned. While walking through the woods, Mulligan became reluctant, but Fisher encouraged him to persevere. About 3:30 p.m., while Jody was resting some distance away, Wilkey ran down a hill after a deer. Mulligan followed him, with Fisher close by. Mulligan shot Wilkey in the back with a 12 gauge slug, mortally wounding him. Fisher yelled to Jody to run for help, then, according to a statement Fisher later made to Steadham, Fisher ran up to Wilkey, who was lying face down on the ground, and told him "if I had my .38 I'd blow your . . . head off." According to Mulligan's later testimony, Fisher attempted to insert his hand into the wound in order to stop Wilkey's heart. Steadham also testified that Fisher later admitted this to him.

When Jody returned with Bedford County officers and the rescue squad, Wilkey was dead. Fisher and Mulligan both gave statements to the effect that Mulligan had slipped while running downhill after Wilkey and that his shotgun had discharged accidentally. The Bedford County authorities at the time treated the shooting as a hunting accident. They charged Fisher and Mulligan with misdemeanors, but when these cases were tried in general district court on December 19, both men were fined and permitted to return to North Carolina. The murder weapon was returned to Fisher.

Two days later, Fisher filed a claim for the $100,000 accidental death benefit on the insurance policy he held on Wilkey's life. Reluctant to make payment, the company initiated an investigation of the circumstances surrounding Wilkey's death and referred the matter to John Manning, an attorney in Greensboro, North Carolina. In May 1984, Fisher went to the attorney's office and belligerently demanded payment, threatening to sue the company and claim punitive damages. The attorney, who was himself a hunter, noted from the autopsy report that wadding from the fatal shotgun shell had entered the wound and penetrated the heart cavity. This, he thought, was inconsistent with the statements of Fisher and Mulligan, and also inconsistent with a drawing Fisher made in the attorney's office, purporting to show that the shotgun had discharged 10 or more feet away from Wilkey's back.

Confronted with this inconsistency, Fisher became less demanding and showed himself amenable to settlement. He eagerly accepted a check from the attorney for $25,000 in exchange for a release of his claim against the company. Later, he paid $7,000 of this to Mulligan.

Wilkey's mother called Fisher from Florida when she heard of her son's death. Fisher told her that at some time before his death, Wilkey had expressed a desire to be cremated "if anything happened to him." She promised to have her son's remains cremated. Fisher told her that Wilkey had no money to help with funeral expenses and that there was no insurance on him. Wilkey's mother had the body brought to Florida and cremated there. Fisher did not attend the funeral, but on that day or the next, called Wilkey's mother, expressed sorrow, and inquired whether the body had in fact been cremated.

Mulligan remained in Charlotte for a few months after the killing, and then moved to South Carolina. In early 1985, he suffered a "nervous breakdown" and confessed the murder to his parents. He was arrested by agents of the Federal Bureau of Investigation in November 1986 and made a full confession of all the details of the crime. During the same month, the Bedford County Grand Jury indicted both Mulligan and Fisher for capital murder. Mulligan entered a guilty plea and was awaiting sentencing at the time of Fisher's trial, in which Mulligan testified for the Commonwealth. Both Mulligan and his attorney testified that Mulligan had received no promises in exchange for his testimony.

Gerald Steadham also testified against Fisher. After Fisher described the killing to him, Fisher offered him $5,000 to kill Mulligan. Fisher said that Mulligan was beginning to talk about the killing and was claiming that Fisher owed him more money. After a time, Steadham decided to tell the Charlotte police of Fisher's statements. Fisher apparently had sources of information within the police force and discovered that Steadham had informed against him. He threatened Steadham's life, which caused Steadham to take his story to the F.B.I., but Fisher and Steadham continued to meet and talk. The F.B.I. began an independent investigation of the crime in late 1985 and used Steadham to gather incriminating admissions from Fisher.[1] On five occasions during

---

[1] In 1984, the Commonwealth's Attorney of Bedford County had undertaken an investigation of the killing, but had been unable to proceed further because of the insurance company's refusal to cooperate.

the ensuing year, Steadham, "wired" by the F.B.I., met with Fisher in various Charlotte coffee houses and engaged him in lengthy conversations during which Fisher occasionally discussed the killing of Wilkey. These conversations were recorded on tape and transcribed. The tapes were played in full as evidence at Fisher's trial.

## II. ASSIGNMENTS OF ERROR

### A. *Lack of Contemporaneous Objection*

 Fisher assigns error to various rulings by the trial court to which no specific contemporaneous objections were made. These include the trial court's refusal to grant a defense request for statements made by Fisher to informants and other persons who were not law-enforcement officers; the court's permitting cameras in the courtroom;[2] the constitutionality of Code § 18.2-31(b) which classifies murder for hire as capital murder; the constitutionality of Code §§ 18.2-18 and 18.2-31(b) which permit an accessory before the fact in a murder for hire to be prosecuted for capital murder; the constitutionality of Code § 19.2-264.2, which prescribes criteria which must be met before the death penalty may be imposed; and the court's failure to notice on its own motion certain comments made by the Commonwealth's Attorney in his closing statement. We will not consider those assignments of error. Rule 5:25.

### B. *Individual Voir Dire*

 Fisher moved the court to permit each venireman to be questioned individually, out of the presence of all others, on *voir dire*. The trial court denied the motion but permitted *voir dire* in panels of three. This matter rested within the court's discretion. *Tuggle v. Commonwealth*, 228 Va. 493, 504-05, 323 S.E.2d 539, 545-46 (1984), *vacated on other grounds*, 471 U.S. 1096 (1985), *on remand*, 230 Va. 99, 334 S.E.2d 838, *cert. denied*, 478 U.S. 1010 (1986). Extensive *voir dire* was conducted and eight veniremen were excused for cause. Fisher makes no contention that the final jury lacked impartiality or that he suffered any prejudice by

---

[2] Cameras were permitted in the courtroom pursuant to a two-year trial period mandated by Code § 19.2-266 and Rule 1:14. The defense made a generalized objection at the time but stated no grounds for it. There was no showing of prejudice or infringement of the defendant's due-process rights.

reason of the court's rulings with respect to *voir dire*. We find no abuse of the trial court's discretion.

### C. *Pre-trial Bail*

██ Fisher was brought from North Carolina to Virginia on December 20, 1986, in custody. He was taken before a Bedford County magistrate that day and ordered to be held without bail. In April 1987, he made a motion for bail which the circuit court heard and denied. The court based its ruling upon Fisher's dangerousness to others, the seriousness of the charge against him, his lack of ties to Virginia, and the risk of flight. The record demonstrated Fisher's extensive criminal record, his general and specific threats against the lives of witnesses against him, and his lack of ties to the community of the forum. The denial of bail in these circumstances was within the trial court's discretion, and we hold that it was not abused. Code § 19.2-120 provides that bail may be denied when there is probable cause to believe either (1) that the accused will not appear for trial, or (2) that his liberty will constitute an unreasonable danger to others. Here, the trial court made both requisite findings, and both were supported by the record.

### D. *Partial Transcripts of Tape Recordings*

Many taped conversations were introduced into evidence at trial, by both sides. The taped conversations between Fisher and Steadham, recorded while Steadham was "wired" by the F.B.I., were lengthy. Long sections of them contained matter irrelevant to the case, such as recordings of the two men ordering dinner in Charlotte restaurants. The Commonwealth had prepared a composite tape containing only those portions of the conversations it deemed relevant to the case. Defense counsel, however, asked that the original tapes be played to the jury in their entirety. The court agreed with the defense and the jury heard the tapes in full.

The Commonwealth had also prepared transcripts of those portions of the tapes which it considered relevant. The Commonwealth proposed, after the tapes had been played in full, to recall Steadham as a witness, to replay those selected parts, and to have Steadham explain to the jury what was meant by some of the expressions used. The Commonwealth intended to provide the jury with the partial transcripts to assist the jurors in understanding Steadham's explanations.

Defense counsel had no objection to the accuracy of the transcripts, but objected to "presenting and giving those transcripts to the jury because we think it does tend to highlight and point out some of it more from the standpoint of the Commonwealth, more damaging and more significant portions of the tape . . . ." Defense counsel stated that he would have no objection if complete transcripts of the tapes were furnished to the jury. The court ruled that after the tapes had been played in full, either side could "highlight" those portions of the tape it wished, and that either side could furnish the jury with transcripts of those parts of the tape it wished to emphasize.

After the tapes were played in full, the court permitted the Commonwealth to recall Steadham, to replay selected portions of the tapes, and to ask Steadham to explain them. Defense counsel again objected on the ground that this would "highlight" certain portions of the tapes the jury had already heard. The court overruled the objection and stated that the testimony was admissible for the purpose of explanation. The Commonwealth then asked to provide transcripts of the selected portions of the tapes to defense counsel and the jury. Defense counsel stated: "same objection." The court overruled the objection. After the Commonwealth's Attorney had completed Steadham's examination in connection with the partial transcripts, he offered them as exhibits. Defense counsel stated:

> MR. GARRETT: Judge, we're not going to interrupt again, we just would assume that our earlier objection —

> THE COURT: Yes.

> MR. GARRETT: — both to the introduction of the transcript, things of that nature, would be continuing.

> THE COURT: That's all right.

The partial transcripts were admitted as exhibits. The defense made no other or further objection to them. Along with the other exhibits, the transcripts were sent to the jury room when the jury retired to deliberate. Defense counsel expressly agreed that the jury should be furnished one copy of each partial transcript along with the other exhibits.

On appeal, Fisher argues that the court erred in permitting the jury to hear the tape recordings, and in receiving in evidence "typed transcripts of those portions of the taped conversation[s] that the Commonwealth wished to emphasize." As stated above, the defense made no objection at trial to the playing of the entire tapes, and we will therefore disregard that assignment of error. Rule 5:25. Further, the defense assigned no error to the court's ruling permitting selected portions of the tape to be played a second time in connection with Steadham's explanations. Rule 5:17(c). We will, accordingly, confine our consideration to the court's rulings concerning the partial transcripts.

The introduction of the partial transcripts in evidence proceeded in three steps. First, the Commonwealth asked leave to furnish copies to jurors and counsel to facilitate understanding of Steadham's explanations of the language used. The defense objected to that procedure, but the objection was properly overruled. A court may, in its discretion, permit the jury to refer to a transcript, the accuracy of which is established, as an aid to understanding a recording. *See Arnold* v. *Commonwealth*, 4 Va. App. 275, 356 S.E.2d 847 (1987). In the circumstances, we find no abuse of discretion in this regard.

The second step, however, introduction of the transcript as an exhibit, involves a different question. After the jury has heard the recording, subsequent recourse to a transcript during deliberations may create a danger that, by repetition, certain parts of the evidence will be overemphasized, at the expense of purely oral testimony. We therefore do not give general approval to the practice.[3] But in the case before us, no error was preserved to the trial court's ruling with respect to this second step. Defense counsel's reference to his "earlier objection," and his expressed wish that it be "continuing" failed to put the trial court on fair notice that a new ground of objection was being raised. The earlier objection, properly overruled, had related to the exercise of the court's discretion in permitting the jury to have copies of the transcripts while hearing the tapes. If the defense were now objecting

---

[3] In the present case, the danger of unfair emphasis was minimized by the introduction of the complete original tape recordings as exhibits. The jurors were at liberty to replay them in full during deliberations if they so desired, thus avoiding unfair emphasis of any part. It is true that they might also have chosen to play only selected passages, but that risk exists when the jury peruses any written exhibit, such as a lengthy document in which only a few parts are relevant.

on the ground that introduction of the transcripts as exhibits might permit the jury to read them during deliberations, unfairly repeating the same evidence, the objection contained no indication of that ground to the trial court.

Rule 5:25 exists to protect the trial court from appeals based upon undisclosed grounds, to prevent the setting of traps on appeal, to enable the trial judge to rule intelligently, and to avoid unnecessary reversals and mistrials. *See Woodson* v. *Commonwealth*, 211 Va. 285, 176 S.E.2d 818 (1970), *cert. denied*, 401 U.S. 959 (1971); *Norfolk So. R. Co.* v. *Lewis*, 149 Va. 318, 141 S.E. 228 (1928); *Keeney* v. *Commonwealth*, 147 Va. 678, 137 S.E. 478 (1927). We hold that the defendant's "continuing" objection was insufficient to meet the requirements of "reasonable certainty" contained in Rule 5:25.

The third step of the procedure involved the transmission of the transcripts to the jury room along with the other exhibits. As noted above, the defense and the Commonwealth expressly agreed to that step and the court, accordingly, permitted it. Code § 8.01-381 expressly authorizes the jury to take exhibits to the jury room in such circumstances. Consequently, we find no error in the court's ruling.

## E. *The "Vileness" Predicate*

At the penalty phase of the bifurcated trial, the court instructed the jury, pursuant to Code §§ 19.2-264.2 and 19.2-264.4, that it could not impose the death penalty unless it found that either the "vileness" predicate or the "future dangerousness" predicate, as detailed in those statutes, had been proved beyond a reasonable doubt. The jury made no finding of "vileness" and based its verdict upon the "future dangerousness" predicate alone. Fisher, on appeal, assigns error to the court's finding that there was sufficient evidence of a "depraved mind" and of "aggravated battery" to warrant instructing the jury on "vileness," and in refusing to submit the case to the jury on "future dangerousness" alone. These assignments lack merit. A verdict based solely upon "future dangerousness" renders moot on appeal all issues related to the "vileness" predicate. *See Payne* v. *Commonwealth*, 233 Va. 460, 469-70, 357 S.E.2d 500, 505-06 (1987), *cert. denied*, 484 U.S. ____, 108 S.Ct. 308 (1988) (vileness finding moots future dangerousness issue).

### F. *"Future Dangerousness"*

 Fisher argues on appeal that the trial court erred as a matter of law in submitting the case to the jury on the issue of "future dangerousness." That argument is inconsistent with the instruction he offered at trial which would have submitted the case to the jury *only* on the issue of "future dangerousness." As noted above, he assigned error to the court's refusal of that instruction. Accordingly, we will not consider that argument. *See* Rule 5:25; *Quintana* v. *Commonwealth*, 224 Va. 127, 148 n.6, 295 S.E.2d 643, 653-54 n.6 (1982), *cert. denied*, 460 U.S. 1029 (1983).

 Because the defendant is entitled to an automatic review of his death sentence, we have examined the record and we are satisfied that the jury's finding of "future dangerousness" is fully supported by the evidence. At trial, Fisher conceded that he had previously been convicted of at least 25 separate felonies. When arrested for the present crime, he was engaged in a "fencing" operation for stolen goods in Charlotte.

The evidence revealed that Fisher had made threats against his girlfriend's estranged husband, offering either "to have him put away" or to "permanently damage" him. The parents of a young woman testified that Fisher offered to get rid of their daughter's boyfriend for $400, promising that the body would never be found. Another witness testified that Fisher importuned him to go to Mexico and find a woman who would marry him in order to gain entry to the United States. Fisher would obtain insurance on the woman's life and the two would then drown her in a river, make the killing appear accidental, and divide the insurance proceeds. The same witness was dating a woman who had an estranged husband. Fisher offered to get rid of the husband for a share in a $100,000 insurance policy the woman had on her husband's life.

As noted above, Fisher had proposed to Wilkey that Bonnie Jones be killed for insurance money, had offered to pay Steadham $5,000 to kill Mulligan, and had solicited another witness to kill Wilkey. He repeatedly threatened to kill any witnesses who came forward to testify against him. Most of the evidence of the defendant's bloodthirstiness emerged from his own statements.

### G. *Summation by the Commonwealth's Attorney*

Defense counsel, at the penalty phase of the trial, ended his closing argument as follows:

And I would remind you that it has been brought out to you four score and underlined in red that there are probably still a dozen or so charges pending in North Carolina. *Clearly, if you sentence this man to life imprisonment he will never see the sun shine again except through bars*, and I think the ends of society will be met. I plead with you, I ask you to let that be your punishment.

(Emphasis added).

The Commonwealth's Attorney promptly objected, out of the jury's presence. The court expressed surprise at the defense argument and ruled that it was improper. Defense counsel apologized, stating that his remarks had been made in error and unintentionally. The Commonwealth's Attorney, who had not yet made his rebuttal argument, asked leave of court to respond to the defense argument.

The court, confronted with an intractable problem, refused to permit the Commonwealth to "go into the matter of parole." The court decided to permit the Commonwealth "in fairness . . . to say, in effect, we deny the statements about this man being behind bars for the rest of his life if you give him life imprisonment." Defense counsel indicated that he would have no objection "because I'm the one that created the situation . . . ." The Commonwealth's Attorney agreed to follow the court's suggestion and defense counsel again expressed his regret at having inadvertently created the problem.

The Commonwealth's Attorney, in his rebuttal, then said:

First of all, the comments which Mr. Garrett concluded with about the sentence of life imprisonment and any charges down in North Carolina; we would emphasize, ladies and gentlemen, that those matters can be brought back, that they are there, nothing's being done with them.

But his statement, ladies and gentlemen, that if you sentence the defendant to life imprisonment that he will never see the light of day other than behind bars, we state to you ladies and gentlemen, I personally state to you as the Commonwealth's Attorney for this county and as an elected official, that is not true, that is not accurate.

The defense made no objection to this argument. At the close of the Commonwealth's rebuttal, defense counsel moved for a mistrial, but expressly excepted from his motion any remarks the Commonwealth's Attorney had made in response to the improper summation by the defense.

Later, at the sentencing hearing, defense counsel acknowledged that his argument had been improper, that the Commonwealth's Attorney "was within his rights" to complain about it, that the defense had made no objection to the court's ruling, and that the defense "did invite error." Nevertheless, the defense then contended that the court had erred in permitting the Commonwealth's Attorney's response and moved the court to set aside the death penalty verdict and to enter judgment for life imprisonment. Fisher assigns error to the court's ruling denying this motion.

The trial court's resolution of the problem created by the defense may not have been the only choice available, but it was a fair one in the circumstances. There was nothing misleading or inaccurate in the Commonwealth's Attorney's statement, and no reference was made to parole. The Commonwealth's Attorney went beyond the court's instructions only in referring to his public office, but in connection with the statement he was authorized to make, that gratuitous addition furnished no information the jury did not already know. We conclude that in the circumstances, the defendant suffered no prejudice by reason of either the court's ruling or the Commonwealth's Attorney's response.

Furthermore, even if we were to assume that the court's ruling was technically erroneous, we hold that Fisher is barred from invoking it on appeal. No litigant, even a defendant in a criminal case, will be permitted to approbate and reprobate — to invite error, as the defense admittedly did here, and then to take advantage of the situation created by his own wrong. *See Sullivan v. Commonwealth*, 157 Va. 867, 878, 161 S.E. 297, 300 (1931).

## III. EXCESSIVENESS AND PROPORTIONALITY

Pursuant to the requirements of Code § 17-110.1(C), we have reviewed the record and have determined that the sentence of death was neither imposed under the influence of passion, prejudice, or any other arbitrary factor, nor is it excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. In making these determinations, we have considered the circumstances of the crime as shown

by the evidence in the record, the evidence of Fisher's "future dangerousness" as set forth above, as well as our review of the records in all capital murder cases reviewed by this Court since the present statutes became effective, giving particular attention to those cases in which the death penalty was based solely on the "future dangerousness" predicate, *e.g., Pope* v. *Commonwealth,* 234 Va. 114, 360 S.E.2d 352 (1987), *cert. denied,* 485 U.S. ____, 108 S.Ct. 1489 (1988), and cases cited therein, 234 Va. at 128, 360 S.E.2d at 361. From that review, we are satisfied that juries in Virginia generally impose the death penalty in similar cases.

Accordingly, we decline to commute the death sentence and will affirm the judgment.

*Affirmed.*