Present:  All the Justices

ROBIN LOVITT

v.  Record No. 001015   OPINION BY JUSTICE BARBARA MILANO KEENAN
    Record No. 001420            November 3, 2000

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Benjamin N. A. Kendrick, Judge

In these appeals, we review the capital murder conviction
and death sentence imposed on Robin Lovitt, along with his
conviction for robbery.

I.  PROCEEDINGS

Lovitt was indicted for capital murder based on the
willful, deliberate, and premeditated killing of Clayton Dicks
during the commission of a robbery, in violation of Code § 18.2-
31(4).  Lovitt also was indicted for the robbery of Dicks, in
violation of Code § 18.2-58.

In the first stage of a bifurcated trial conducted under
Code § 19.2-264.3, a jury convicted Lovitt of the offenses
charged.  In the penalty phase of the trial, the jury fixed his
punishment for capital murder at death based on a finding of
"future dangerousness," and for robbery at life imprisonment.
The trial court sentenced Lovitt in accordance with the jury
verdict.

We consolidated the automatic review of Lovitt's death sentence with his appeal of the capital murder conviction. Code § 17.1-313(F). We also certified Lovitt's appeal of his robbery conviction from the Court of Appeals and consolidated that appeal with his capital murder appeal. Code § 17.1-409.

## II. GUILT PHASE EVIDENCE

We will state the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party in the trial court. Walker v. Commonwealth, 258 Va. 54, 60, 515 S.E.2d 565, 568 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 955, (2000); Roach v. Commonwealth, 251 Va. 324, 329, 468 S.E.2d 98, 101, cert. denied, 519 U.S. 951 (1996). The evidence showed that in the early morning hours of November 18, 1998, Clayton Dicks was stabbed six times in the chest and back while working during the overnight shift at Champion Billiards Hall (the pool hall) in Arlington County.

A few months before the killing, Lovitt worked as a cook at the pool hall on an evening shift that ended when Dicks arrived to begin the overnight shift. Amy Hudon, the manager at the pool hall, testified that about two months before Dicks was killed, she had trouble opening a cash register drawer near a pool table and asked Lovitt to help her open the drawer. Lovitt opened it by "wedging" a pair of scissors into the drawer's

2

latch.  About two months before the killing, Lovitt quit working at the pool hall.

On November 17, 1998, the day before the killing, Lovitt went to the Arlington home of his cousin and tried to sell him a television set.  The same day, Lovitt spoke to an acquaintance in a failed attempt to find a job.

Later that night, Lovitt went to the pool hall between 8:00 and 10:00 p.m. and spoke with people he knew.  When Lovitt asked some of them for money, each refused his request.  Two of these people recalled that Lovitt wore a flannel shirt that night.  The bartender that night, Thomas Schweiker, did not know Lovitt but remembered giving matches to a man leaning over the bar.  Later, Schweiker noticed that a pitcher containing cash from cigarette sales was missing from beneath the bar where the man had been leaning.  Schweiker testified that the man, an African-American in his middle or late twenties, had a stocky build and facial hair, and was wearing a plaid flannel shirt.

Dicks arrived at the pool hall between 1:30 and 2:00 a.m.  The other employees present when Dicks arrived had left the pool hall by 3:00 a.m., leaving Dicks as the sole employee on the premises.  The last four patrons in the pool hall that morning left between 2:45 and 3:00 a.m.  One of these patrons was Officer Dennis A. Holland of the United States Capitol Police, who was a long-time patron at the pool hall.  Holland testified

that he saw a man who looked "familiar" enter the pool hall as he and his friends were leaving.  Holland described the man as being black, about five feet, ten or eleven inches tall, weighing between 185 and 190 pounds, and wearing a flannel shirt.

About 3:25 a.m., José N. Alvarado and Carlos Clavell entered the pool hall and saw two men arguing behind the bar. Alvarado testified that one man was shorter than the other, and that the shorter man repeatedly shoved the taller man, who was wearing an apron.  Alvarado stated that he and Clavell watched as the shorter man stabbed the taller man six or seven times with a silver-colored weapon.  Alvarado saw blood on the taller man's apron and watched as the taller man fell to the floor behind the bar.  Clavell testified that he heard the taller man begging the shorter man to stop attacking him.  Both Alvarado and Clavell saw the assailant repeatedly kick the man who had fallen to the floor.

Alvarado and Clavell immediately ran from the pool hall to a service station, where Alvarado telephoned the "911" emergency response number and reported what they had seen.  Although Alvarado could not identify Lovitt as Dicks's assailant at the preliminary hearing held in this case, Alvarado testified at trial that he was about "80% certain" that Lovitt was the assailant.

4

When police and emergency medical personnel arrived at the pool hall in response to Alvarado's telephone call, they found Dicks lying on the floor behind the bar in a pool of blood. Dicks was alive but was unable to speak and was taken by helicopter to a nearby hospital. The multiple stab wounds prevented his heart from functioning, and he died while awaiting surgery.

Dicks had been stabbed six times, five times in the chest and once in the back. Four of these wounds were lethal. Dicks also suffered two areas of internal hemorrhage on both sides of his head, as well as external abrasions on both shoulders and on his left knee.

The police recovered from the pool hall a cash register that was lying on the floor near where Dicks was found. The register was broken into pieces, the cash drawer had been removed from the register and was missing, and a torn piece of a ten-dollar bill was found nearby. A pair of scissors with orange handles that was usually kept in a container on the bar was missing. A police canine unit found an orange-handled pair of scissors bearing blood lying open in the woods about 15 yards behind the pool hall.

Warren A. Grant, Lovitt's cousin, testified that Lovitt arrived at Grant's home in the early morning hours of November 18, 1998. Grant lived about a quarter of a mile from the pool

hall in a residential area located on the "other side" of the woods. Grant stated that Lovitt knocked on his door sometime between 1:30 and 3:00 a.m. Lovitt was wearing a plaid shirt and entered the house carrying what looked like a large, square, gray metal box. After Lovitt unsuccessfully tried to open the locked box, Grant eventually opened it by using a screwdriver to "pop" some of the screws securing the box. Lovitt removed money from the opened cash register drawer and divided the cash between himself and Grant. Lovitt left the cash register drawer with Grant and instructed him to "[g]et rid of [it]." A few days later, Grant began cutting the cash drawer into pieces with tin snips and put them in a bag.

Grant's girlfriend, Delores L. Harris, testified that she was in Grant's house that morning and watched Grant and Lovitt open the cash register drawer. She noticed that Lovitt looked "sweaty" and gave him a towel.

On November 20, 1998, Arlington Detective Noel E. Hanrahan obtained pieces of the cash register drawer from Grant. Four days later, Lovitt was arrested and charged with the present offenses. At that time, he was wearing a plaid shirt and a dark jacket, and he told the police that he had been wearing the same clothes for the past few days. When Officer Stephen Ferrone collected Lovitt's clothing at the jail, Ferrone asked a detective whether he needed to seize Lovitt's jacket. Ferrone

6

testified that, upon hearing this question, Lovitt stated, "I wasn't wearing it when it happened."

Julian J. Mason, Jr., a forensic scientist employed by the Virginia Division of Forensic Science, qualified as an expert witness on the subject of tool mark identification. He testified that the cash register drawer Grant surrendered to the police had been removed from the broken cash register found on the floor of the pool hall. Mason also stated that the pry marks on the cash register drawer were made by the scissors that were found in the woods behind the pool hall.

Lawrence Abrams, an identification technician for the Arlington County Police Department, testified that he was not able to obtain fingerprints from the handle of the scissors due to its irregularly-shaped surface. The only identifiable fingerprints obtained in relation to the present crimes were Grant's fingerprints that were obtained from the cash register drawer.

Carol Palmer, a forensic scientist employed by the Virginia Department of Forensic Science, qualified as an expert witness on DNA testing. Palmer extracted human DNA from two places on the scissors, on a blade near the tip and on a blade near the finger loops. She also extracted blood from three small circular areas on the left front side of Lovitt's jacket, but the DNA tests were inconclusive and Palmer was unable to

7

determine whether the blood on the jacket was human.  Palmer found no blood on the flannel shirt, black jeans, or shoes that Lovitt was wearing when he was arrested.

Palmer testified that she performed DNA testing using the "polymerase chain reaction," or PCR, technique on the DNA extracted from the scissors.  The DNA extracted from the tip of the scissors displayed a DNA profile that matched the DNA profile of Dicks.  The profile derived from this sample did not match the DNA profiles of either Lovitt or Grant, thus eliminating both as contributors of this DNA.  Palmer stated that the chance of someone other than Dicks contributing the DNA sample on the tip of the scissors was 1 in more than 5.5 billion.

The DNA extracted from the mid-section of the scissors also matched the DNA profile of Dicks.  However, Palmer stated that this DNA evidence, unlike the DNA evidence from the tip of the scissors, did not exclude either Lovitt or Grant and, thus, was inconclusive as to them.

After Lovitt's arrest, he was incarcerated in the Arlington County Jail in the same unit as Casel Lucas.  Lovitt and Lucas developed a friendship during the two months that they lived together in this unit.  Lovitt first told Lucas that after leaving the bathroom at the pool hall on the night of the murder, Lovitt saw a Hispanic man stabbing Dicks.  Lovitt told

Lucas that, at that time, Lovitt saw the cash register drawer, grabbed it, and ran from the pool hall.

According to Lucas, Lovitt later stated that he knew Dicks and was aware that no one else would be in the pool hall late at night. Lovitt further related that he waited in the bathroom until everyone left the pool hall before coming out of the bathroom to attempt to open the cash register drawer. Dicks confronted Lovitt as he unsuccessfully attempted to open the cash drawer. Lovitt told Lucas that he had to kill Dicks because Dicks had recognized him. According to Lovitt, Dicks asked him, "[W]hy [are] you doing this?" Lovitt admitted to Lucas that he stabbed Dicks several times and took the cash register drawer to his cousin's house where he and his cousin split the money before leaving to buy some drugs. Lovitt told Lucas that he discarded the murder weapon while en route to or from Grant's house, and that he changed his clothes at Grant's house because he had blood on his shirt and pants.

Detective Irv Ellman testified that he has been employed by the City of Alexandria Police Department for about 15 years. He stated that he has known Lucas since 1994, that he knows other people in the law enforcement community who know Lucas, and that Lucas has a reputation among the law enforcement community for being truthful.

On cross-examination, Ellman testified that he was aware of Lucas's felony convictions. When asked if he knew how many convictions Lucas had, Ellman stated, "Myself, I'm responsible for probably 14 counts, some burglaries and a recent armed burglary. That is how I know that he is truthful." When asked whether Lucas had testified on a previous occasion in an unrelated case in order "to cut a deal against someone else," Ellman replied that he knew Lucas had testified in an earlier case, but did not know if he had made a "deal" with the prosecutor. When asked whether he believed that Lucas would lie to help or save himself, Ellman replied, "No."

Detective Stuart Chase of the Arlington County Police Department testified that Carlos Clavell, one of the two witnesses to the killing, told Chase that he saw "a light-colored vehicle, probably a Cadillac" parked in the pool hall parking lot when he and Alvarado arrived at the pool hall that night. Clavell told Chase that he saw the Cadillac again when he and Alvarado ran to telephone the police, but that the car was gone when they returned to the pool hall with the police.

Andre M. Boyd and Tashia A. Davis testified that they were at the pool hall on the night of the killing, and that Lovitt asked each of them for money. Boyd and Davis left the pool hall together between 2:45 and 3:00 a.m. on November 18, 1998. According to Boyd, he and Davis walked to Boyd's mother's house

10

about seven blocks away.  However, Davis testified that she and Boyd left the pool hall parking lot in a 1987 gray Cadillac and drove to Boyd's mother's house on Oxford Street.

State Trooper T. L. Robinson testified that on November 18, 1998, between 3:00 and 4:00 a.m., he was notified by a police dispatcher to "be on the lookout" for an older white Cadillac. Robinson reported to the dispatcher that 10 to 15 minutes earlier, he had seen a white, 1973 Cadillac Eldorado pass below a highway ramp on which he was parked.

### III.  PENALTY PHASE EVIDENCE

During the penalty phase of the trial, the Commonwealth presented evidence of Lovitt's criminal record.  In October 1975, when Lovitt was 11 years old, he was charged with assault and placed in protective supervision.  Also as a juvenile, in August 1979, Lovitt was committed to the Beaumont Learning Center of the State Department of Corrections (Beaumont) based on adjudication of charges of breaking and entering and larceny. While at Beaumont, Lovitt was disciplined for fighting, assault, and possessing contraband items.  After his release from Beaumont in 1980, Lovitt was convicted of grand larceny in 1981 and was sentenced to 12 months in jail.

Between 1983 and 1985, Lovitt was convicted of petit larceny, grand larceny, breaking and entering, and distribution of marijuana.  In 1986, Lovitt was convicted of attempted

11

robbery and was sentenced to a term of imprisonment of from one to three years. After being released on parole in August 1987, Lovitt's parole was revoked in August 1988 based, in part, on additional arrests and his failure to pass certain drug tests. Lovitt later was convicted of statutory burglary and grand larceny. While incarcerated on these convictions and the parole violation, Lovitt was disciplined for damaging property and for fighting.

In September 1990, Lovitt again was released on parole. In early 1991, Lovitt was convicted of possession of cocaine, grand larceny, and burglary. While incarcerated on these charges, Lovitt was the subject of ten disciplinary actions for offenses including possession of contraband, disobeying direct orders, assault, possession of intoxicants, and manufacturing "shank handles." After being released on parole in October 1996, Lovitt was convicted in 1997 of possession of marijuana, petit larceny, unlawful entry, assault and battery, and destruction of property. Lovitt was on parole at the time of the present offenses.

In October 1998, Arlington County Police Officer Jerome A. Lee detained Lovitt in an apartment parking lot in Arlington. Lovitt had parked his car behind the apartments, appeared to be very nervous, and consented to a search of his vehicle. Lee found a long kitchen knife on the floor of the passenger area

12

and a soda can used to smoke crack cocaine in the rear floor area of the vehicle.

Lovitt presented testimony from his sister, Amanda Jones, who testified that Lovitt was the oldest of 12 children and that he helped take care of his younger siblings, although not "gladly."  Lovitt also presented testimony from four deputies employed by the Arlington County Sheriff's Office, who stated that Lovitt had not presented any disciplinary problems while being held in jail on the present charges.

## IV. ISSUES PREVIOUSLY DECIDED

On appeal, Lovitt raises certain arguments that we have resolved in previous decisions.  Since we find no reason to modify our previously expressed views, we reaffirm our earlier holdings and reject the following arguments:

A.  Imposition of the death penalty constitutes cruel and unusual punishment in violation of the United States Constitution and the Constitution of Virginia.  Rejected in Johnson v. Commonwealth, 259 Va. 654, 667, 529 S.E.2d 769, 776 (2000); Yarbrough v. Commonwealth, 258 Va. 347, 360 n.2, 519 S.E.2d 602, 607 n.2 (1999); Goins v. Commonwealth, 251 Va. 442, 453, 470 S.E.2d 114, 122, cert. denied, 519 U.S. 887 (1996).

B.  The "future dangerousness" aggravating factor is unconstitutionally vague because (1) it requires jurors to reach a finding based on the confusing standard of a "probability"

"beyond a reasonable doubt;" and (2) the failure to provide jury instructions regarding the meaning of the term "future dangerousness" violates the United States Constitution and the Constitution of Virginia. Rejected in Johnson, 259 Va. at 667, 529 S.E.2d at 776; Walker, 258 Va. at 61, 515 S.E.2d at 569; Cherrix v. Commonwealth, 257 Va. 292, 299, 513 S.E.2d 642, 647, cert. denied, ___ U.S. ___, 120 S.Ct. 177 (1999); Williams v. Commonwealth, 248 Va. 528, 536, 450 S.E.2d 365, 371 (1994), cert. denied, 515 U.S. 1161 (1995); Smith v. Commonwealth, 219 Va. 455, 476-78, 248 S.E.2d 135, 148-49 (1978), cert. denied, 441 U.S. 967 (1979).

C. The "future dangerousness" aggravating factor unconstitutionally permits consideration of unadjudicated conduct. Rejected in Johnson, 259 Va. at 667, 529 S.E.2d at 776; Cherrix, 257 Va. at 299, 513 S.E.2d at 647; Williams, 248 Va. at 536, 450 S.E.2d at 371.

D. Virginia's penalty phase instructions do not adequately instruct the jury concerning mitigation. Rejected in Buchanan v. Angelone, 522 U.S. 269, 275-76, (1998); Yarbrough, 258 Va. at 360 n.2, 519 S.E.2d at 607 n.2; Cherrix, 257 Va. at 299, 513 S.E.2d at 647; Swann v. Commonwealth, 247 Va. 222, 228, 441 S.E.2d 195, 200, cert. denied, 513 U.S. 889 (1994).

E. The post-verdict review of the death sentence by the trial court does not satisfy constitutional standards because

the trial court may consider hearsay evidence contained in a pre-sentence report and is not required to set aside the death sentence upon a showing of good cause.  Rejected in Johnson, 259 Va. at 667-68, 529 S.E.2d at 776; Walker, 258 Va. at 61, 515 S.E.2d at 569; Cherrix, 257 Va. at 299-300, 513 S.E.2d at 647; Breard v. Commonwealth, 248 Va. 68, 76, 445 S.E.2d 670, 675-76, cert. denied, 513 U.S. 971 (1994).

F.   The trial court's refusal to permit the defendant to question prospective jurors individually during voir dire violates the defendant's constitutional right to a fair and impartial jury.  Rejected in Cherrix, 257 Va. at 300, 513 S.E.2d at 647; Goins, 251 Va. at 453, 470 S.E.2d at 122; Swann, 247 Va. at 228, 441 S.E.2d at 200.

G.   The trial court's refusal to permit the defendant to make additional peremptory strikes as an added procedural safeguard in death penalty cases fails to ensure the defendant's constitutional rights.  Rejected in Walker, 258 Va. at 64, 515 S.E.2d at 571; Clagett v. Commonwealth, 252 Va. 79, 85, 472 S.E.2d 263, 266-67 (1996), cert. denied, 519 U.S. 1122 (1997); Swann, 247 Va. at 227, 441 S.E.2d at 199.

H.   This Court's proportionality review in death penalty cases, as presently conducted, unconstitutionally denies defendants meaningful review because this Court fails to give appropriate consideration to cases in which sentences of life

imprisonment are imposed. Rejected in <u>Bailey v. Commonwealth</u>,
259 Va. 723, 740-41, 529 S.E.2d 570, 580-81 (2000).

## V. MOOT ISSUE

Lovitt challenges the constitutionality of the Virginia
death penalty statutes on the basis that the aggravating factor
of vileness, as set forth in Code § 19.2-264.4(C), is
unconstitutional both on its face and as applied to his case.
He bases this argument on his assertion that the statutory terms
are unconstitutionally vague. However, we do not address
Lovitt's arguments regarding this issue, because the jury
elected to base his sentence of death only on the "future
dangerousness" predicate. When a death sentence is based solely
on "future dangerousness," all issues related to the "vileness"
predicate are rendered moot. <u>See</u> <u>Swann</u>, 247 Va. at 228 n.2, 441
S.E.2d at 200 n.2; <u>Fisher v. Commonwealth</u>, 236 Va. 403, 414, 374
S.E.2d 46, 53 (1988), <u>cert. denied</u>, 490 U.S. 1028 (1989).

## VI. ADDITIONAL CONSTITUTIONAL CHALLENGE

Lovitt argues that the "future dangerousness" aggravator is
unconstitutionally "vague as applied," because this Court has
allowed the language of this aggravating factor to be applied in
an "unfettered" manner in several other of the capital murder
convictions that the Court has upheld on appeal. We find no
merit in this argument, because our determination of the
sufficiency of the evidence of "future dangerousness" in other

cases does not provide a basis for reversing the jury's finding of "future dangerousness" in Lovitt's case. Lovitt's allegation that the evidence in his case of "future dangerousness" was insufficient as a matter of law must be determined based on the facts of his own case. Thus, the application of the "future dangerousness" predicate in other cases does not affect the question whether Lovitt's death sentence should be upheld.

## VII. JURY SELECTION

Lovitt argues that the trial court abused its discretion in refusing to strike one juror for cause after she stated with visible emotion that about ten years earlier, when she was a student at the University of Florida, five neighbors whom she did not know were murdered. We disagree with Lovitt's argument.

On appellate review, we give deference to the trial court's determination whether to exclude a prospective juror, because the trial court was able to see and hear each member of the venire respond to the questions posed. Thus, the trial court is in a superior position to determine whether a juror's responses during voir dire indicate that the juror would be prevented or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath. Vinson v. Commonwealth, 258 Va. 459, 467, 522 S.E.2d 170, 176 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 2226 (2000); Stewart v. Commonwealth, 245 Va. 222, 234, 427 S.E.2d 394, 402, cert.

17

denied, 510 U.S. 848 (1993). A trial court's decision on this issue will not be disturbed on appeal absent a showing that the trial court abused its discretion. Vinson, 258 Va. at 467, 522 S.E.2d at 176; Roach, 251 Va. at 343, 468 S.E.2d at 109.

In conducting our review, we consider the juror's entire voir dire, not merely isolated statements. Vinson, 258 Va. at 467, 522 S.E.2d at 176; Clagett, 252 Va. at 90, 472 S.E.2d at 269; Mackall v. Commonwealth, 236 Va. 240, 252, 372 S.E.2d 759, 767 (1988), cert. denied, 492 U.S. 925 (1989). In the present case, the juror was asked whether her experience in Florida would make it difficult for her to serve as a juror. She replied, "I think it is something that I would find emotionally challenging, but at the same time, if I was picked as a juror, I would be able to do my duty." In response to a question whether her experience made her predisposed to the death penalty, the juror stated that the Florida case "has nothing to do with this case, I'm sure." In addition, the juror responded in the affirmative when asked whether she could "keep an open mind" in deciding the case.

The above responses are illustrative of the entire voir dire of the juror, which contains no indication that the trial court abused its discretion in accepting her statement that she could fulfill the duties of a juror in the trial of the case. Thus, we conclude that the trial court did not abuse its

18

discretion in refusing to strike this juror for cause from the jury panel.

## VII. GUILT PHASE ISSUES

Lovitt argues that the trial court erred when it permitted Detective Irv Ellman to testify concerning witness Casel Lucas's reputation for truth and veracity. Lovitt objected to Detective Ellman's testimony prior to its admission on the grounds of relevance. When the Commonwealth responded that Detective Ellman would testify concerning Lucas's reputation for truthfulness in the police community, and the trial court ruled that the testimony was admissible, Lovitt made no further objection. Ellman then testified, as stated above, that he had known Lucas since 1994, that he knew others in the law enforcement community who knew Lucas, and that Lucas had a good reputation in that community for being truthful.[1]

After the Commonwealth rested its case and the trial court denied Lovitt's motion to strike the evidence, Lovitt moved the court to strike Ellman's testimony on two new grounds. First, Lovitt argued that the Commonwealth had failed to lay a foundation for Ellman's testimony and had established only that Lucas had admitted his involvement in 14 felony offenses.

---

[1]Lovitt does not argue on appeal that the trial court erred in overruling the objection to Ellman's testimony that he made on the grounds of relevance. Since Lovitt has abandoned that

Second, Lovitt asserted that the "police community" was "too small a group and not a proper group" upon which to base testimony about Lucas's reputation for truthfulness.  The prosecutor did not object to the timeliness of these new objections and, after the trial court considered counsel's arguments, it upheld its earlier ruling that Ellman's testimony was admissible and denied Lovitt's motion to strike the testimony.[2]

This sequence of events reveals that after the Commonwealth rested its case, Lovitt presented to the trial court new challenges to previously admitted evidence.  In essence, Lovitt was requesting that the evidence be reopened so that Ellman's testimony could be stricken and the jury instructed to disregard it.  Our holdings in Woodson v. Commonwealth, 211 Va. 285, 288, 175 S.E.2d 818, 821 (1970); Poole v. Commonwealth, 211 Va. 258, 260, 176 S.E.2d 821, 823 (1970), make it abundantly clear that after the Commonwealth has rested its case, it is not error for the trial court to refuse a new objection that has been raised regarding previously admitted evidence.  Here, the trial court

argument on appeal, we do not consider the merits of that objection.

[2]On brief, Lovitt raises an additional, new argument that the trial court erred in refusing to strike Detective Ellman's testimony because it consisted only of Ellman's opinion, which was based on specific acts.  Since Lovitt did not raise this argument at trial, we do not consider the argument here.  Rule 5:25.

considered the arguments of counsel and although the court did not rely on the timing of Lovitt's objections in making its ruling, the court rejected the objections, thus declining to reopen the evidence. Accordingly, the result that the trial court reached was proper under Woodson and Poole.[3]

Lovitt next argues that the trial court erred in permitting a probation officer to testify that Lovitt failed to appear for an appointment which was scheduled to take place five hours after the time of the killing. Lovitt also argues that the trial court erred in admitting into evidence a capias for Lovitt's arrest, which showed that Lovitt missed a required court appearance on the day following Dicks's killing. Lovitt concedes that this evidence of flight is "marginally probative," but contends that its prejudicial effect as evidence of prior bad acts outweighs its probative value. We disagree with Lovitt's arguments.

Flight by a defendant after the commission of a crime is probative evidence of guilt of that crime. Clagett, 252 Va. at 93, 472 S.E.2d at 271; Boykins v. Commonwealth, 210 Va. 309, 313-14, 170 S.E.2d 771, 774 (1969). The admission of such evidence of a potentially prejudicial nature is a matter submitted to the trial court's sound discretion for a

_____

[3]In light of our holding, we need not address the merits of the reasons given by the trial court underlying its denial of

determination whether the probative value of the evidence outweighs its prejudicial effect.  See Orbe v. Commonwealth, 258 Va. 390, 402, 519 S.E.2d 808, 815 (1999), cert. denied, ___ U.S. ___, 120 S.Ct. 1970 (2000); Coe v. Commonwealth, 231 Va. 83, 87, 340 S.E.2d 820, 823 (1986).  Here, Lovitt's conduct tended to prove that immediately after the killing, he sought to avoid any contact with law enforcement officials and the courts.  This evidence also directly rebutted the assertion of defense counsel during opening argument that Lovitt did not avoid contact with the police in the days following the killing.  Thus, the trial court did not abuse its discretion in balancing the probative value of this evidence against its potential prejudicial effect that Lovitt had disregarded his probation officer's instructions and was being sought by the police for failure to appear at a court hearing of an unspecified nature.

Lovitt next argues that the trial court erred in denying his motion to strike the capital murder charge on the ground that the evidence was insufficient as a matter of law.  He notes that José Alvarado, one of two witnesses to the killing, was unable to identify Lovitt at the preliminary hearing as Dicks's assailant and, at trial, was only "80% certain" that Lovitt was the assailant.  Lovitt also contends that the testimony concerning the Cadillac automobile parked in the pool hall lot,

_____

these two new objections.

and the fact that Warren Grant's blood and fingerprints were found on the cash register drawer while Lovitt's were not, "favor[] Lovitt's innocence."  Lovitt also observes that the DNA found near the handle of the scissors, which failed to exclude Lovitt as its donor, also failed to exclude Grant.  Thus, Lovitt argues, the totality of the evidence "does not rise to the 'beyond a reasonable doubt' standard."  We disagree with Lovitt's arguments.

The evidence, viewed in the light most favorable to the Commonwealth, is sufficient to support the jury verdict.  As stated above, the jury received evidence that Lovitt had an immediate need for money.  He had worked at the pool hall, and he was familiar with the employee work shifts and the location of cash kept on the premises.  Also, he knew that he could pry open the cash register drawer with a pair of scissors, as he had done on an earlier occasion.  Lovitt was seen at the pool hall earlier in the evening when he was unsuccessful in his attempt to obtain money from some people he knew.  Later, the bartender at the pool hall, who did not know Lovitt, noticed that a pitcher containing some cash was missing from beneath the bar in an area where a man matching Lovitt's general description had been standing.

Officer Holland testified that a person matching Lovitt's general description was in the pool hall about 3:00 a.m.,

shortly before the killing. José Alvarado, who witnessed the killing, testified that he was "80% certain" that Lovitt was Dicks's assailant.

A pair of scissors belonging to the pool hall was identified as the murder weapon and was found in the woods that led from the pool hall to Grant's house. Lovitt could not be eliminated as a possible source of the DNA found on the murder weapon.

Grant and his friend, Delores Harris, testified that Lovitt appeared at Grant's house, which was a short distance from the pool hall, in the very early morning hours of the day in question, carrying a cash register drawer that was later determined to have been taken from the pool hall. After Grant pried open the drawer, Lovitt divided the money with Grant.

At the time he was arrested, Lovitt volunteered to the police officer collecting his clothes that he was not wearing the jacket "when it happened." Lovitt later admitted his commission of the crime to Casel Lucas. Several aspects of this confession were corroborated by other evidence, such as the evidence that Lovitt was unable to open the cash register drawer at the time of the offense, and evidence that Lovitt fled to Grant's house after the killing. In addition, there was evidence corroborating Lucas's statement that Lovitt told him that he decided to kill Dicks because he could identify Lovitt.

24

Dicks would have been able to identify Lovitt based on his earlier employment at the pool hall.

Lovitt's attacks on the credibility of Alvarado, Grant, Harris, Davis, Boyd, and Lucas were resolved against Lovitt by the jury's determination of Lovitt's guilt. Thus, based on the above-stated evidence, and the reasonable inferences that can be drawn from the evidence, we conclude that the evidence is sufficient to support the jury's determination of guilt on the capital murder charge.

Lovitt next argues that the trial court erred in refusing to permit Lovitt's counsel to testify after Carol Palmer, a forensic witness, made a statement during cross-examination that allegedly was inconsistent with a statement she had made to Lovitt's counsel prior to trial. Lovitt's counsel requested that he be allowed to testify that in an earlier telephone conversation with him, Palmer replied in the affirmative when he asked her, "[W]ould you expect there to be a blood transfer from the victim to the perpetrator?" Lovitt asserts that the trial court abused its discretion in denying his counsel's request to withdraw from the case and allow his co-counsel to complete Lovitt's defense.

In response, the Commonwealth contends that Lovitt did not argue in the trial court that he should be allowed to withdraw and have his co-counsel continue representing Lovitt. The

Commonwealth asserts that, instead, Lovitt's counsel argued that he should be permitted to testify and then continue to represent Lovitt along with his co-counsel. We agree with the Commonwealth's argument.

At the time he asked the court to be allowed to testify concerning his telephone conversation with Palmer, Lovitt's counsel did not request to withdraw from his representation of Lovitt and have co-counsel remain as sole counsel in the case. Lovitt's counsel asserted only that because "something [came] up in the middle of the trial that was unexpected and unanticipated[,] . . . I can testify." Since Lovitt's counsel did not argue to the trial court that he should be allowed to withdraw from the case and co-counsel continue Lovitt's representation, we will not consider that argument on appeal. Rule 5:25.

## VIII. SENTENCING PHASE ISSUES

Lovitt contends that the trial court erred in denying his request to argue to the jury that he would die in prison if given a sentence of life imprisonment without the possibility of parole. We disagree.

There is no evidence in the record to support such an argument, which is speculative in nature. Moreover, the argument is incorrect as a matter of law, since prisoners who have received a sentence of life imprisonment without

possibility of parole are not precluded from receiving executive clemency for crimes they have committed.  See Va. Const. art. V, § 12.  In addition, we observe that the jury was instructed that the words "imprisonment for life" mean "imprisonment for life without the possibility of parole."  Lovitt was permitted to argue to the jury that he would not be eligible for parole.  In fact, Lovitt argued that "he can die in prison just because of the nature of prisons.  He can die in there.  And we certainly know that he is not eligible for parole."

Lovitt next contends that the evidence is insufficient to support the jury's finding of "future dangerousness."  Lovitt argues that his prior burglary, larceny, and narcotics convictions are not evidence of "future dangerousness," and that his aggressive behavior while incarcerated never resulted in criminal charges being brought against him.  He also argues that, since he is ineligible for parole after being convicted of these offenses, the only society that should be considered in this case for purposes of "future dangerousness" is prison society.  We disagree with Lovitt's arguments.

Under Code § 19.2-264.2, the death penalty may not be imposed unless the trier of fact finds one or both of the two aggravating factors that we have referred to as "future dangerousness" and "vileness."  Roach, 251 Va. at 347, 468 S.E.2d at 111-12; Yeatts v. Commonwealth, 242 Va. 121, 139, 410

27

S.E.2d 254, 265 (1991), cert. denied, 503 U.S. 946 (1992).  In

the present case, the jury found "future dangerousness," meaning

that "there is a probability that [Lovitt] would commit criminal

acts of violence that would constitute a continuing serious

threat to society."  Code § 19.2-264.2.

This Court has recognized that the facts and circumstances

surrounding a capital murder may be sufficient, standing alone,

to support a finding of "future dangerousness."  See Roach, 251

Va. at 348, 468 S.E.2d at 112; Murphy v. Commonwealth, 246 Va.

136, 145, 431 S.E.2d 48, 53, cert. denied, 510 U.S. 928 (1993).

Here, Lovitt murdered Dicks, an innocent employee, to facilitate

a robbery and to avoid being identified as its perpetrator.  The

jury was entitled to find that this violent, calculated action

was strong evidence that Lovitt is a dangerous person who would

commit future criminal acts of violence.

In addition, the jury was entitled to consider Lovitt's

extensive criminal record, which we have recited in detail.

This record includes an attempted robbery conviction and three

burglary convictions.  As we observed in Yeatts:

> Burglary laws are based primarily upon a recognition
> of the dangers to personal safety created by the usual
> burglary situation–the danger that the intruder will
> harm the occupants in attempting to perpetrate the
> intended crime or to escape and the danger that the
> occupants will in anger or panic react violently to
> the invasion, thereby inviting more violence.

28

242 Va. at 140, 410 S.E.2d at 266 (citations omitted).  Thus, Lovitt's prior burglary convictions, in addition to his attempted robbery conviction, were relevant evidence in determining his "future dangerousness."

The jury also heard evidence that Lovitt committed several criminal offenses while released in the community on supervised probation or parole.  This evidence demonstrated that Lovitt did not refrain from further serious criminal activity, even when the consequences of such criminal behavior would be especially severe.

We find no merit in Lovitt's argument that the only relevant "society" for the jury's consideration of his "future dangerousness" was prison society.  Code § 19.2-264.2 requires that the jury make a factual determination whether the defendant "would commit criminal acts of violence that would constitute a continuing serious threat to society."  The statute does not limit this consideration to "prison society" when a defendant is ineligible for parole, and we decline Lovitt's effective request that we rewrite the statute to restrict its scope.  Thus, we conclude that the evidence of the present offenses and of Lovitt's prior criminal behavior, including the evidence of his behavior while incarcerated for earlier offenses, is sufficient to support the jury's finding of "future dangerousness."

IX. SENTENCE REVIEW

29

Under Code § 17.1-313(C), we review the death sentence imposed on Lovitt to determine whether it (1) was imposed under the influence of passion, prejudice, or any other arbitrary factor; or (2) is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Lovitt argues that his sentence was based on passion, prejudice, and arbitrariness because, during the trial, Dicks's family sat in the three rows of seats closest to the jury box. Lovitt contends that the jury showed its prejudice by the contents of two notes that it sent to the judge on the second day of the guilt phase trial, and by the fact that it reached its verdict in the guilt phase trial in one and one-half hours. We find no merit in this argument.

In the first note at issue, the jury asked whether Lovitt had been identified before the trial in a police "lineup." While the trial court and counsel were discussing this question, the jury sent the judge a second note, requesting that all personal information about the jurors be removed from the public record in the case. In response to these notes, the trial court cautioned the jury to restrict its consideration of the case to the evidence presented. The court also informed the jury that the court would not tolerate any interference or intimidation from any outside source, and that any such conduct would be

quickly addressed.  In response to questioning by the court, the jurors indicated that no outside source had attempted to influence them, and that they had not discussed the case with anyone else.

These notes from the jury do not provide any indication of passion or prejudice, and the trial court's responses to them were proper.  In addition, the record does not show that the jurors knew the identity of the spectators who sat in the seats nearest the jury box.  Moreover, the length of time that the jury deliberated in the guilt phase trial did not indicate passion or prejudice on its part and, if anything, reflected the overwhelming nature of the evidence presented against Lovitt.

## Excessiveness and Proportionality

Lovitt argues that the trial court erred when it denied his motion to commute the sentence to life imprisonment "based upon a proportionality review of similar cases."  We find no merit in this argument.

Initially, we observe that the death penalty statutes do not require a proportionality review by the trial court.  Instead, Code § 19.2-264.5 directs that "[a]fter consideration of the [post-sentence] report, and upon good cause shown, the [trial] court may set aside the sentence of death and impose a sentence of imprisonment for life."  This provision permits the capital murder defendant the same opportunity as any other

31

criminal defendant, under a precise and unambiguous standard, to request that the trial court alter the jury's verdict. Bassett v. Commonwealth, 222 Va. 844, 860, 284 S.E.2d 844, 854 (1981), cert. denied, 456 U.S. 938 (1982). Here, after hearing argument from Lovitt's counsel comparing the facts and circumstances of Lovitt's case and the sentences imposed, with the facts and circumstances of other capital murder cases and the sentences imposed in those cases, the trial court declined to exercise its discretionary authority under the statute to impose a sentence of life imprisonment. Based on the record before us, we conclude that the trial court did not abuse its discretion in declining to alter the sentence fixed by the jury.

In conducting this Court's proportionality review, we must determine whether "other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." Johnson, 259 Va. at 683; 529 S.E.2d at 786 (quoting Jenkins v. Commonwealth, 244 Va. 445, 461, 423 S.E.2d 360, 371 (1992), cert. denied, 507 U.S. 1036 (1993)). We have compared the record in the present case with the records of other capital murder cases, including those in which a sentence of life imprisonment was imposed. We also have examined the records of all capital cases reviewed by this Court pursuant to Code § 17.1-313(E). Since the jury imposed the death sentence

32

based on the "future dangerousness" predicate, we give particular consideration to other capital murder cases in which the death penalty was obtained under that predicate.

Lovitt has directed our attention to certain capital murder convictions in which sentences of life imprisonment were imposed.  However, under our proportionality review, we must consider whether juries generally impose a death sentence for conduct similar to that of the defendant, not whether certain juries have declined to impose the death sentence in other particular cases.  Jackson v. Commonwealth, 255 Va. 625, 636, 499 S.E.2d 538, 545 (1998), cert. denied, 525 U.S. 1067 (1999); King v. Commonwealth, 243 Va. 353, 371, 416 S.E.2d 669, 679, cert. denied, 506 U.S. 957 (1992); Stamper v. Commonwealth, 220 Va. 260, 283-84, 257 S.E.2d 808, 824 (1979), cert. denied, 445 U.S. 972 (1980).

The record shows that Lovitt planned to commit the offense of robbery and murdered Dicks for the sole reason of eliminating any witness to the robbery.  The multiple stab wounds inflicted on Dicks reflect an escalation of the violent and dangerous criminal activity detailed in Lovitt's prior criminal record.  As stated above, Lovitt's prior record includes numerous felony convictions, including a conviction for attempted robbery and multiple convictions on burglary charges.  Lovitt committed several of these prior crimes while on supervised probation or

parole, which is further evidence of his continuing failure to refrain from serious criminal conduct.

We observe that juries in this Commonwealth, with some exceptions, generally have imposed the death sentence for convictions of capital murder based on a finding of "future dangerousness" in which the underlying predicate crime was robbery.  See, e.g., Jackson, 255 Va. 625, 499 S.E.2d 538; Roach, 251 Va. 324, 468 S.E.2d 98, Chandler v. Commonwealth, 249 Va. 270, 455 S.E.2d 219, cert. denied, 516 U.S. 889 (1995); Joseph v. Commonwealth, 249 Va. 78, 452 S.E.2d 862, cert. denied, 516 U.S. 876 (1995); Swann, 247 Va. 222, 441 S.E.2d 195; Chichester v. Commonwealth, 248 Va. 311, 448 S.E.2d 638 (1994), cert. denied, 513 U.S. 1166 (1995); Dubois v. Commonwealth, 246 Va. 260, 435 S.E.2d 636 (1993), cert. denied, 511 U.S. 1012 (1994); Yeatts, 242 Va. 121, 410 S.E.2d 254; Savino v. Commonwealth, 239 Va. 534, 391 S.E.2d 276, cert. denied, 498 U.S. 882 (1990); Mackall, 236 Va. 240, 372 S.E.2d 759; Townes v. Commonwealth, 234 Va. 307, 362 S.E.2d 650 (1987), cert. denied, 485 U.S. 971 (1988).  Based on this review, we hold that Lovitt's death sentence is neither excessive nor disproportionate to penalties imposed by other sentencing bodies in the Commonwealth for comparable crimes, considering both the crime and the defendant.

## X. CONCLUSION

34

We find no reversible error in the judgments of the trial court.  Having reviewed Lovitt's death sentence pursuant to Code § 17.1-313, we decline to commute the sentence of death. Accordingly, we will affirm the trial court's judgments.

Record No. 001015 –– <u>Affirmed.</u>
Record No. 001420 –– <u>Affirmed.</u>

35