COURT OF APPEALS OF VIRGINIA

**UNPUBLISHED**

Present: Judges Beales, O'Brien and Raphael
Argued at Lexington, Virginia


GREGORIO CORONA VALDERAMA, A/K/A
 JUAN CARLOS BECERRA-REYES

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0385-23-3                      JUDGE RANDOLPH A. BEALES
                                                            JUNE 11, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF HENRY COUNTY
G. Carter Greer, Judge

Samantha Offutt Thames, Senior Appellate Attorney (Virginia
Indigent Defense Commission, on briefs), for appellant.

Kelly L. Sturman, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


The Circuit Court of Henry County convicted Gregorio Corona Valderama (also known as

Juan Carlos Becerra-Reyes) of distributing between 10 and 100 grams of methamphetamine in

violation of Code § 18.2-248.[1]  On appeal, Valderama contends that both the suspected drugs

collected by the police and the certificate of analysis identifying the drugs were inadmissible

because the Commonwealth failed to establish the requisite chain of custody.  In addition,

Valderama challenges the sufficiency of the evidence to support his conviction.

I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, [as] the prevailing party at trial."  *Gerald v.*

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The trial court dismissed a separate charge for possession with intent to distribute over 100 grams of methamphetamine arising from an unrelated incident.

*Commonwealth*, 295 Va. 469, 472 (2018) (quoting *Scott v. Commonwealth*, 292 Va. 380, 381 (2016)). "This principle requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

The Commonwealth presented evidence at trial that on October 30, 2020, Special Agent Patrick Meade of the Virginia State Police's Sixth Division, along with three other investigators, met a confidential informant, James Hairston, as part of an undercover narcotics investigation of Valderama, a suspected methamphetamine dealer. Special Agent Meade testified that he and the other investigators met Hairston at "a predetermined meet location," where Hairston called Valderama and agreed to meet him outside a nearby restaurant to purchase two ounces of methamphetamine. Special Agent Meade explained how he searched Hairston prior to the undercover drug transaction, and he determined that Hairston did not have any contraband on him. Special Agent Meade then gave Hairston $1,600 in cash to make the controlled purchase.[2] Task Force Officers Todd Farris and Nick Samuels of the Drug Enforcement Administration similarly testified that, prior to the undercover drug transaction, they searched Hairston's vehicle, and they

---

[2] Special Agent Meade acknowledged that he did not recall exactly how he searched Hairston. He testified that, before conducting a controlled drug purchase, he typically searches a confidential informant's

> person, their pockets, their front pockets, back pockets, if they happen to have a jacket on, anything like that. We even go to the point of searching their socks and their shoes, just checking anything where they could have any type of contraband, whether it be a weapon, money, knife, something to that effect. So we just search their person.

also did not find any contraband.[3]  In addition, Task Force Officer Jonathan Cox of the Bureau of Alcohol, Tobacco, Firearms and Explosives testified that, prior to the undercover drug transaction, he gave Hairston a video-recording device and a secondary device that transmitted an audio recording to the investigators in real time.[4]  Hairston testified that, after placing the video-recording device in his vehicle, he drove directly to the restaurant to meet Valderama.  The investigators then followed Hairston to the restaurant and parked nearby, monitoring the transmission from the audio-recording device in real time.

The Commonwealth introduced into evidence at trial footage from the video-recording device in Hairston's vehicle that captured the undercover drug transaction and Hairston's movements to and from the restaurant parking lot.  Hairston testified that, after he parked outside the restaurant and called Valderama, Valderama came out of the restaurant and got into the front passenger seat of Hairston's vehicle.  Footage from the recording device showed that, after the two exchanged pleasantries, Hairston asked Valderama, "You got them all?"  Valderama replied, "I got it, yeah."  Valderama then removed a package wrapped in green tape from the breast pocket of his jacket and handed it to Hairston, assuring him that the package contained "two" and was "good."  Hairston paid Valderama with the cash provided by Special Agent Meade, and Hairston placed the package of suspected drugs in the center console of his vehicle.  Hairston testified that the package had "like a wrapping around it," and he maintained that "once it was set down, I never touched it

---

[3] Officer Farris and Officer Samuels also acknowledged that they did not recall exactly how they searched Hairston's vehicle.  Officer Farris noted that, when searching a vehicle for contraband generally, "I search anywhere something that could be reasonably, you know, hidden either before or after the buy."  Officer Samuels explained, "We search the compartments inside the vehicle, like the console, glove box, trunk, up under the seats, the compartments on the doors, . . . under the floor mats.  If there is anything inside the vehicle, we look through that."

[4] Officer Cox testified that the recording device could not be manipulated, that he did not instruct Hairston how to turn the recording device on or off, and that he later downloaded the footage from the recording device.  Hairston confirmed that he did not know how to turn the recording device on and off.

again." The video footage showed that Valderama told Hairston that he would call him later about a "kilo of cocaine." Hairston testified that, once Valderama got out of his vehicle, he drove directly "[b]ack to the meeting spot" without making any stops and waited for the investigators who had been following him to arrive.

Hairston testified that the investigators searched him again after they regrouped. Officer Cox testified that, after retrieving the recording device from Hairston's vehicle, he searched Hairston's vehicle and found no contraband. Special Agent Meade similarly testified that he searched Hairston again, and he did not find any contraband or "any leftover money." Hairston confirmed that the investigators "patted everything I had on" and "searched everything" both before and after the undercover drug transaction.

At trial, Special Agent Meade detailed the manner in which he handled and processed the evidence during the investigation. He testified, "I took custody of the suspected drugs that day. They was wrapped in green duct tape. I take that and secure that. I notate that and the time I was able to receive that back from the -- Mr. Hairston." Special Agent Meade stated that he then put the package containing the suspected drugs "in an evidence bag and sealed that evidence bag." He also marked the sealed evidence bag with his initials and a unique case number before placing the sealed evidence bag in his locked patrol vehicle. He explained, "The bags have a specific number assigned to them, which I put in my report and I also put on my control purchase checklist which match."

Special Agent Meade then transported the sealed evidence bag to an evidence locker in the police station. He later retrieved the sealed evidence bag from the evidence locker, stating, "Sergeant Dennis McBride removed it from the locker and it was given to me, and I was there

- 4 -

present."[5]  Noting that the sealed evidence bag was in the same condition as when he originally found it, Special Agent Meade then mailed the sealed evidence by certified mail to a state laboratory for testing.  Meade maintained that he did not open the package or manipulate or alter its contents before sending it to the state laboratory.

The sealed evidence bag was later received by a forensic analyst with the Virginia Department of Forensic Science for testing.  After examining the crystal-like substance from the evidence bag, the forensic analyst produced a certificate of analysis documenting the results of her testing.  "Item 1" on the certificate of analysis was described as "[o]ne plastic bag wrapped in green tape which contained one ziplock bag which contained off-white crystalline substance."  According to the certificate of analysis, the bag contained 56.845 grams of methamphetamine.

At trial, Special Agent Meade identified Commonwealth's Exhibit 2 (the plastic bags containing a crystal-like substance).  He testified that the evidence bag bore his initials and the unique case number associated with his investigation.  He also identified the package as the one he collected from Hairston's vehicle and then mailed to the state laboratory for testing although the package was no longer wrapped in the green painter's tape.  Meade explained that "the green painter's tape had been removed to open it up to be analyzed" by the forensic analyst.  The Commonwealth also sought to introduce Exhibit 4 (the certificate of analysis).

Valderama objected to the introduction of both exhibits, arguing that they were inadmissible because the Commonwealth failed to establish the requisite chain of custody of the drugs.  Counsel for Valderama asserted that, given Special Agent Meade's testimony that the package was no longer

_____

[5] Sergeant McBride testified that he did not specifically recall retrieving the evidence for Special Agent Meade.  While there was nothing on the package indicating that he was the individual who retrieved the evidence, Sergeant McBride noted, "Special Agent Meade would have placed this in the temporary locker at the time he seized it, and I would have retrieved it for him to send it to the lab for exam."  Sergeant McBride also stated that he was the only individual who could have retrieved the package at that time, and he confirmed that he did not alter, manipulate, or change the contents of the package in any way.

wrapped in green tape, the package must have been "altered and changed in some way since it has been packaged." In addition, counsel for Valderama argued that, given Sergeant McBride's testimony that he did not recall handling the items in Commonwealth's Exhibit 2, it was possible that the suspected drugs in Commonwealth's Exhibit 2 and those identified in the certificate of analysis were not the drugs Special Agent Meade collected from Hairston's vehicle.

The trial court found that "it really doesn't make that much difference" whether Sergeant McBride recalled retrieving the package from the evidence locker and giving it to Meade because "Special Agent Meade testified that Sergeant McBride retrieved the item and handed it to him, and that he then mailed it in certified mail, return receipt requested, to the lab. And when he mailed it, it was -- it had not been tampered with." The trial court credited Sergeant McBride's testimony that "he never opened the package, didn't alter or change it" before Special Agent Meade sent it to the state laboratory for testing. The trial court concluded that the Commonwealth satisfied its "burden to prove chain of custody and the Court will admit the item as Commonwealth's number 2." The trial court also admitted Commonwealth's Exhibit 4, the certificate of analysis.

After the Commonwealth's case-in-chief, Valderama moved to strike the evidence, arguing that it was insufficient to prove that he sold Hairston the drugs admitted at trial because the evidence failed to exclude his alternate hypothesis of innocence that Hairston already possessed those drugs before the transaction and afterward claimed he purchased them from Valderama. The trial court denied the motion and Valderama's subsequent renewed motion on the same grounds. During his closing argument, Valderama reiterated that the evidence failed to exclude his alternate hypothesis of innocence that Hairston might have concealed the drugs in his vehicle before the transaction and later told police that he purchased them from Valderama.

Describing this matter as "an airtight case on behalf of the Commonwealth," the trial court found that the investigators thoroughly searched Hairston and his vehicle both before and after the

undercover drug transaction and did not find any drugs. The trial court noted that, although the investigators did not personally see the controlled purchase occur, video footage obtained from the recording device in Hairston's vehicle showed Valderama "pulling out a package from inside his jacket and putting it down on the console, and when he did that, he said that's two." The trial court further noted that the video showed Hairston handing Valderama "a huge wad of bills equaling sixteen hundred dollars." The trial court remarked that "this was the clearest video surveillance of a drug transaction that I have ever seen. And I've seen quite a few. The audio was perfect. The Court could hear every word that was said." The trial court then found Valderama guilty beyond a reasonable doubt of distributing between 10 and 100 grams of methamphetamine in violation of Code § 18.2-248. Valderama now appeals the trial court's judgment to this Court.

## II. ANALYSIS

### A. Admissibility of Commonwealth's Exhibit 2 and Exhibit 4

On appeal to this Court, Valderama argues, "The trial court erred in admitting Commonwealth trial exhibits 2 and 4, as the evidence failed to establish a chain of custody."

This Court has previously stated, "The determination on a chain of custody challenge lies within the trial court's broad discretion and will not be overturned on appeal absent an abuse of that discretion." *Pope v. Commonwealth*, 60 Va. App. 486, 511 (2012). "Under this deferential standard, a 'trial judge's ruling will not be reversed simply because an appellate court disagrees;' only in those cases where 'reasonable jurists could not differ' has an abuse of discretion occurred." *Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 753, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)). This Court has consistently held, "[W]here there is mere speculation that contamination or tampering could have occurred, it is not an abuse of discretion to admit the evidence and let what doubt there may be go to the weight of the evidence." *Jeter v. Commonwealth*, 44 Va. App. 733,

739 (2005) (quoting *Reedy v. Commonwealth*, 9 Va. App. 386, 391 (1990)). Furthermore, the Supreme Court has explained that "a chain of custody is properly established when the Commonwealth's evidence affords reasonable assurance that the exhibits at trial are the same and in the same condition as they were when first obtained." *Vinson v. Commonwealth*, 258 Va. 459, 469 (1999).

Here, the record demonstrates that the Commonwealth proved "every 'vital link in the chain of possession.'" *Hargrove v. Commonwealth*, 53 Va. App. 545, 554 (2009) (quoting *Alvarez v. Commonwealth*, 24 Va. App. 768, 777 (1997)). Special Agent Meade testified that he collected the package wrapped in green tape from Hairston's vehicle and placed the contents in an evidence bag. Meade then sealed the bag, marked his initials on the bag, marked a unique case number on the bag, and then placed the bag in his locked patrol vehicle. Special Agent Meade also testified that he then transported the evidence to the police station and placed it in a secure evidence locker. He recounted that Sergeant McBride later retrieved the evidence from the locker at his request and gave it to him. Finally, Special Agent Meade recalled mailing the evidence to the state laboratory for testing. Subsequent forensic testing established that the package contained methamphetamine.

While Sergeant McBride did not remember handling the specific items described in Commonwealth's Exhibit 2, Special Agent Meade testified that Sergeant McBride retrieved the sealed evidence bag from the evidence locker at Meade's request. *See Anderson v. Commonwealth*, 48 Va. App. 704, 717 (2006) ("A court need not hear, however, from every witness who physically handled the samples for the certificate to be admissible."). Sergeant McBride then handed the bag to Special Agent Meade before Meade mailed the evidence to the state laboratory. In addition, Special Agent Meade testified that he did not open the package and that he did not manipulate or alter its contents before sending it to the state laboratory. Meade

acknowledged that the package marked as Commonwealth's Exhibit 2 was no longer wrapped in green tape, but he explained that the state laboratory had removed the green tape from the package during forensic testing. Furthermore, the certificate of analysis reflects that the forensic analyst received and examined the contents of "Item 1," which were described as "[o]ne plastic bag wrapped in green tape which contained one ziplock bag which contained off-white crystalline substance." Therefore, the Commonwealth's evidence provided "'reasonable assurance' that the evidence obtained by the police was the same evidence tested." *Anderson*, 48 Va. App. at 717 (quoting *Vinson*, 258 Va. at 469). Consequently, we certainly cannot say that the trial court abused its discretion by admitting Commonwealth's Exhibit 2 and Exhibit 4.

## B. Sufficiency of the Evidence

Valderama also argues on appeal to this Court, "The trial court erred in denying the motion to strike the charge of distribution in violation of Virginia Code § 18.2-248, where the Commonwealth failed to prove that Mr. Valderama distributed a *controlled substance*." Highlighting Hairston's "unfettered access to his car," Valderama contends that the Commonwealth "failed to prove that the bundle of narcotics came from" him. Valderama further contends that the Commonwealth failed to exclude his reasonable hypothesis of innocence that Hairston "clearly had the time prior to the sale to hide any manner of narcotics in his car, and time after the sale as he drove back to their meeting location alone to pull those hidden drugs from the car."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is "plainly wrong or without evidence to support it."'" *Secret v. Commonwealth*, 296 Va. 204, 228 (2018) (alteration in original) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id*. (alteration in original) (quoting *Pijor*, 294 Va. at 512). "Rather, the relevant

- 9 -

question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)).

This Court has consistently held, "Whether an alternate hypothesis of innocence is reasonable is a question of fact and, therefore, is binding on appeal unless plainly wrong." *Lucas v. Commonwealth*, 75 Va. App. 334, 348 (2022) (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). As the Supreme Court has emphasized, "[T]he factfinder ultimately remains responsible for weighing the evidence." *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017). "In that capacity, the factfinder determines which reasonable inferences should be drawn from the evidence, and whether to reject as unreasonable the hypotheses of innocence advanced by a defendant." *Id.*

Here, a rational factfinder could reject Valderama's claim that Hairston might have concealed the package containing the suspected drugs in his vehicle before the undercover drug transaction and then accused Valderama of selling the drugs to him. As this Court has often stated, "Determining the credibility of witnesses . . . is within the exclusive province of the [factfinder], which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015) (first alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). At trial, Hairston testified that he purchased the package containing "two ounces of meth" from Valderama. Consistent with Hairston's testimony, the video footage of the undercover drug transaction clearly showed that Valderama handed Hairston a package wrapped in green. The video footage also supported Hairston's testimony that he drove to and from the restaurant to conduct the controlled purchase without stopping or removing any items from his vehicle.

In addition, Special Agent Meade testified that he and the other investigators carefully searched Hairston and his vehicle before the undercover drug transaction. The investigators confirmed that Hairston did not possess any contraband before meeting with Valderama. The investigators then searched Hairston and his vehicle for contraband after the undercover drug transaction, and they only found the package containing the suspected drugs — which the Commonwealth later introduced into evidence at trial. Therefore, we certainly cannot say that the trial court was plainly wrong or without credible evidence in rejecting Valderama's alternate hypothesis of innocence that Hairston might have concealed the package containing the drugs in his vehicle before the undercover drug transaction and later accused Valderama of selling these drugs to him. *Cf. Maust v. Commonwealth*, 77 Va. App. 687, 705 (2023) (en banc) (holding that "lapses in police surveillance or the presence of other individuals during controlled buys do not render the evidence insufficient"). Consequently, given all of the testimony and evidence in the record, we definitely cannot say that no rational factfinder could have found the evidence sufficient to support Valderama's conviction.

## III. CONCLUSION

In short, the trial court did not abuse its discretion by admitting Commonwealth's Exhibit 2 and Exhibit 4 because the Commonwealth established the requisite chain of custody for the drugs. In addition, the Commonwealth's evidence was sufficient for a rational factfinder to conclude that Valderama distributed between 10 and 100 grams of methamphetamine in violation of Code § 18.2-248. Therefore, for all of the foregoing reasons, we affirm the trial court's judgment and uphold Valderama's conviction.

*Affirmed.*